790 A.2d 675

**Jean Posner GORDON et al.**

v.

David B. POSNER et al.

No. 2295, September Term, 2000.

Court of Special Appeals of Maryland.

Jan. 31, 2002.

400

402

---

Shale D. Stiller (Kurt J. Fisher and Piper, Marbury, Rudnick & Wolfe, LLP, on the brief), Baltimore, for appellants.

Peter E. Keith (Bonnie A. Travieso, Gallagher, Evelius & Jones, LLP, Baltimore, E. Pete Summerfield and Summerfield, Willen, Silverberg & Limsky, P.A., Owings Mills, on the brief), for appellee, Posner.

James A. Dunbar, Mark D. Maneche and Venable, Baetjer and Howard, LLP, on the brief, Baltimore, for appellee, McDonagh.

Argued before ADKINS, PAUL E. ALPERT, (Retired, Specially Assigned), JOHN J. BISHOP, Jr., (Retired, Specially Assigned) JJ.

ADKINS, Judge.

The issue in this case is who should bear federal and state estate taxes for the estate of Rose Posner ("Rose") attributable to a $4.9 million Marital Trust that was created under the will of Rose's late husband. Jean Posner Gordon, M.D. and Judith Geduldig, appellants and cross-appellees, contend that the trial court erred in concluding that the Maryland Uniform Estate Tax Apportionment Act, Maryland Code (1988, 1997 Repl.Vol.), section 7–308 of the Tax General Article ("TG") (the "Tax Apportionment Act") applies, and requires payment of a portion of the tax from their interests in the Marital Trust. We shall hold that the trial court was correct when it determined that Rose did not elect to opt out of the Tax Apportionment Act in her will or Revocable Trust.

## FACTS AND LEGAL PROCEEDINGS

Nathan Posner ("Nathan") died on April 21, 1975, survived by his wife, Rose, and his three children: daughters Judith Geduldig and Jean Posner Gordon (the "Daughters") and son David B. Posner, M.D. ("David"). Rose died 21 years later, on October 28, 1996. David was appointed personal representative of Rose's estate.

Nathan left a will devising one-half of his estate to a trust for the benefit of Rose (the "Marital Trust"), but omitting the clauses expressing the terms of the trust. The absence of trust terms created doubt as to whether the Marital Trust would qualify for the federal estate tax marital deduction, which would enable Nathan's estate to defer taxes on the assets in the Marital Trust until the death of Rose. At the time of Nathan's death, in order to qualify a trust for the

surviving spouse's benefit as a marital trust, the spouse had to be given the right to all income, and a general power of appointment over the trust assets. *See* 26 U.S.C. § 2056 (1981), *amended by* Pub.L. No. 97–34, § 403(d)(1).

Although Nathan's will did not otherwise provide for either the income interest or the power of appointment, it did have a marital deduction "savings clause." This clause provided:

Anything in this Will to the contrary notwithstanding, . . . my Trustee shall not have or exercise any authority, power or discretion over the Marital Trust or the income thereof, or the property constituting the same, nor shall any payment or distribution by my Trustee be limited or restricted by any provision of this Will, which would in any way (a) adversely affect the qualification of the Marital Trust, (b) prevent my estate from receiving the benefit of the maximum marital deduction, or (c) affect the right of my said wife to all income therefrom or her right to dispose of the principal and income thereof in the amount and to the extent necessary to qualify the Marital Trust for the marital deduction for Federal estate tax purposes . . .

The balance of Nathan's estate, after the bequest to the Marital Trust, passed to a residuary trust, which eventually passed in equal parts to David and the Daughters. James P. McDonagh, appellee, serves as trustee of the Marital Trust.

Notwithstanding the omissions in Nathan's will, his personal representative claimed the marital deduction for the assets passing to the Marital Trust on Nathan's federal estate tax return, and attached a copy of Nathan's will to that return. The Internal Revenue Service (the "IRS") audited the return, but did not question the deductibility of the Marital Trust.

Nearly twenty one years after her husband's death, on January 3, 1996, Rose executed a will which purported to exercise her power of appointment over the Marital Trust, directing that its assets be paid to an inter vivos Revocable Trust (the "Revocable Trust") that had been created on the same day. In her will, Rose gave one hundred dollars to appellant Geduldig, and a photograph to appellant Gordon,

stating, with respect to each, that the bequest represented her "entire inheritance." Rose's will directed that the balance of her probate estate would pass to the Revocable Trust, to be disposed of according to its terms.

The Revocable Trust included gifts of certain tangible personal property to relatives and to a charity. It also directed payment of sizable specific amounts to David, to David's wife, to friends, to several charities, to a trust for the benefit of Rose's sister, and to a trust for the benefit of David's children. The Revocable Trust also directed payment of only one hundred dollars to each of the Daughters, and recited, with respect to each, that this sum was her "entire distribution from this Trust." The balance, if any, passed to David.

Rose transferred most of her assets to the Revocable Trust during her lifetime. At her death in October 1996, the Revocable Trust was valued at $10,756,659.

In a suit filed in the Circuit Court for Baltimore County, Case No. 97–1002, on January 31, 1997 (the "Prior Litigation"), the Daughters challenged their mother's right to exercise a power of appointment over the Marital Trust, contending that their father's will did not grant her a general testamentary power of appointment. On July 24, 1997, before that court ruled in the Prior Litigation, David paid the estate taxes for Rose's estate, including taxes attributable to inclusion of the Marital Trust in her estate. Less than three weeks after the tax was paid, the circuit court held, on cross-motions for summary judgment, that Rose had an inter vivos power of appointment only, and directed that the assets from the "Marital Trust therefore revert to [Nathan] Posner's estate to be distributed according to the residuary clause in his Will." Under this judgment, the Daughters would receive two-thirds of the Marital Trust and David would receive one-third.

On appeal, this Court held that Rose did not have a testamentary power of appointment over the assets of the Marital Trust, and affirmed the trial court. In dicta, we also stated that the language of Nathan's will was "insufficient to grant

Rose Posner either an *inter vivos* or a testamentary power of appointment...."

On July 21, 1999, the Daughters filed the complaint in this suit, in the Circuit Court for Baltimore City, against their brother and the trustee of the Marital Trust. They asserted that the trustee of the Marital Trust refused to distribute the Trust assets because he was concerned that David might file a claim against the Marital Trust for contribution to the federal estate taxes that David had paid. The Daughters sought declaratory relief, asking the court to rule that David was not entitled to claim any contribution from the Marital Trust for taxes that he paid. In response, David filed an answer and counterclaim for contribution, seeking judgment for the amount of the Maryland and federal estate taxes paid with respect to the Marital Trust, together with pre-judgment interest.

On cross-motions for summary judgment, the circuit court ruled that the three Posner children, as beneficiaries of the Marital Trust, must bear responsibility for the federal and Maryland estate taxes paid on the Marital Trust assets. The court ordered each of the Daughters to contribute $711,740.30 in federal tax and $193,212.72 in Maryland estate tax. The court declined to grant pre-judgment interest. The Daughters appealed from this judgment, and Posner cross-appealed over the denial of pre-judgment interest.

After this Court's decision in the Prior Litigation, David filed with the IRS a claim for a refund of $2,909,000, representing the taxes that were attributable to the Marital Trust. On July 16, 2001, while this appeal was pending, the IRS issued a technical advice memorandum, stating its position that the Marital Trust was includable in Rose's gross estate for federal tax purposes.

Both Rose's will and her Revocable Trust contained provisions addressing the payment of estate taxes. We will describe these more fully in our discussion.

## DISCUSSION

### I.

### Rose Posner Did Not Opt Out Of The Tax Apportionment Act

The Tax Apportionment Act sets forth how the federal estate tax and the Maryland estate tax shall be apportioned among the persons interested in an estate. It provides that "apportionment shall be made in the proportion that the value of the interest of each person interested in the estate bears to the total value of the interests of all persons interested in the estate." TG § 7–308(b). A " '[p]erson interested in the estate' means any person who is entitled to receive or has received . . . any property or interest in property included in the taxable estate of the decedent." TG § 7–308(a)(4). Under the statutory formula, the taxes on the Marital Trust would be paid from the interest of each person in that Trust. In other words, the Daughters would bear their proportionate share of the taxes attributable to the Marital Trust property, rather than having all the estate taxes paid by the residuary beneficiaries of Rose's probate estate or Revocable Trust.

As might be expected, the statute affords the testator an opportunity to opt out of the statutory directive. The operative language of the statute provides that it will apply **"except as otherwise provided in the will or other controlling instrument[.]"** TG § 7–308(k). In order to effectively opt out of the Tax Apportionment Act, however, the directive **not** to apportion must be "plainly stated in the will." *Johnson v. Hall*, 283 Md. 644, 649, 392 A.2d 1103 (1978). In *Johnson*, the Court of Appeals joined what it described as "a small minority of courts" requiring explicit language stating an intention not to apportion, *see id.* at 651, 392 A.2d 1103, although "[n]o magic or mystical word or phrase is required." *Id.* at 655, 392 A.2d 1103.

The Daughters make a number of arguments regarding why the terms of Rose's will dictated that the Marital Trust should

not share in the estate tax burden, and we address each of them in our discussion below.

■ The standard of review for a grant of summary judgment is whether the trial court was "legally correct." *See Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 204, 680 A.2d 1067 (1996). Our first step is to review the established principles of will construction, and then examine the pertinent text of Rose's will.

■ The "cardinal principle of construction of wills [is] that the intention of the testator be carried out as deduced from the 'four corners' of the will." *Wesley Home, Inc. v. Mercantile–Safe Deposit & Trust Co.,* 265 Md. 185, 198, 289 A.2d 337 (1972). The "testator's intent, when clearly expressed in a testamentary document, must prevail." *Veditz v. Athey,* 239 Md. 435, 445, 212 A.2d 115 (1965); *accord Emmert v. Hearn,* 309 Md. 19, 23, 522 A.2d 377 (1987)("paramount concern" is to carry out testator's intent). The entire will must be considered, not merely selective words in a vacuum. "When interpreting a will, we must gather the intention of the testator from the language of the entire will." *Jacob v. Davis,* 128 Md.App. 433, 451, 738 A.2d 904 (1999), *cert. denied,* 357 Md. 482, 745 A.2d 436 (2000). The court must avoid a ridiculous result that would defy the intention of the testator. If the words of a will "are susceptible of two constructions, one of which would produce an absurd result and the other would carry out the testator's intention, the latter construction should be adopted." *Gideon v. Fleischmann,* 193 Md. 203, 207, 66 A.2d 403 (1949).

■ Turning to Rose's will, we examine two clauses in the will that are pertinent to Rose's intentions with regard to the payment of taxes. Item Second provides:

I direct that the full amount of all estate, inheritance, succession and transfer taxes and any and all other governmental charges, of whatever nature, which may be lawfully assessed as a consequence of my death … shall be paid by my Personal Representative out of the general assets of my

estate, without the right of reimbursement therefor whatever from any person or corporation.

The Daughters would have us look only at Item Second, and interpret that item to mean that Rose directed that the taxes attributable to the Marital Trust would not be paid by that Trust, but rather by her probate estate. As we set forth above, however, we are required to look at the entire will, *see Jacob*, 128 Md.App. at 451, 738 A.2d 904, and thus we also turn to Item Fifth, the only other relevant portion of Rose's will. It provides, in pertinent part:

I give, devise and bequeath all of the rest, residue and remainder of my estate, real and personal, of whatsoever kind, nature and description and wheresoever the same may be situate and howsoever acquired, including all assets which are subject to my power of appointment pursuant to the Marital Trust created under Item Two of the Last Will and Testament of my late husband, Nathan Posner and any and all other property over which I may have power of testamentary disposition, unto DAVID B. POSNER, as Trustee of the Rose B. Posner Revocable Trust Agreement dated January 3, 1996 to be held, managed and distributed in accordance with the terms and conditions recited therein.

Examining these two items of the will, we now ask what Rose intended by the words "general assets of my estate." Specifically, we ask whether the Marital Trust was intended to be included within those words, or whether it was intended to be exonerated from the payment of estate taxes.

We do not consider the words in Item Second to be clear. They would have been clearer, for example, if Rose had said that the taxes should be paid from her probate estate, which would exclude both her Revocable Trust and the Marital Trust. Item Five, however, adds significant clarification. There, she explicitly referred to "my estate," and specified that her estate "includ[ed] all assets which are subject to my power of appointment pursuant to the Marital Trust created under [my husband's will]."

Further evidence of Rose's intent is found in her Revocable Trust. In Article VII of that Trust, titled "Payment of Taxes, Debts and Expenses," Rose, as settlor, wrote:

Upon the death of Settlor, the Trustees shall follow any directions of the Personal Representative of Settlor's probate estate regarding payment of any Federal Estate ... taxes, debts, and other valid claims and expenses which are enforceable against Settlor's estate.

If there are no such directions from the Personal Representative, the Trustee, in the Trustee's discretion, is authorized to pay the Settlor's debts outstanding at the time of Settlor's death.... Such debts may include valid death taxes and other governmental charges imposed under the laws of the United States or of any State or country by reason of such death, including interest and penalties attributable to the trust estate arising because of the Settlor's death[.]

Neither party has asserted that we should not consider the terms of the Revocable Trust in determining Rose's intent regarding apportionment of estate taxes, and we consider it appropriate to do so. The Tax Apportionment Act, in section 7 308(k), allows the testator to elect out of the act by providing "otherwise ... in the will or other controlling instrument." Md.Code (1974, 2001 Repl.Vol.), section 4–411(b) of the Estates and Trusts Article ("ET"), renders valid a bequest to an *inter vivos* trust, even though the trust was not executed according to the strictures of ET § 4–102, requiring the attestation of two witnesses, and even though the trust is subject to amendment or modification after the will is executed. Because Rose specifically bequeathed the residue of her estate to the Revocable Trust, to be held, managed, and distributed in accordance with its terms, we conclude that the Revocable Trust becomes a "controlling instrument" for purposes of the Tax Apportionment Act.

Thus, it is clear that Rose intended that estate taxes would be paid not just from her probate estate, but also from the assets of the Revocable Trust, which she intended would

receive the assets of the Marital Trust. Moreover, there is nothing in the Revocable Trust to suggest that Rose intended that the Marital Trust assets, once received by the Revocable Trust, would be segregated from the other assets in that Trust, or shielded from the payment of estate taxes.

The Daughters agree, to some extent. They posit that "[t]he companion Revocable Trust provisions worked in conjunction with the will to require that the taxes be paid from the probate estate and Revocable Trust." They still see the Marital Trust, however, as a "person" from whom David could not recover taxes, arguing that "Rose's Will and Revocable Trust obligated [David] to draw upon the assets of **her** probate estate and Revocable Trust to the extent necessary to enable **Rose's** general estate to pay taxes without reimbursement from **any person**." The problem with the Daughters' argument is that in Item Five of her will, Rose specifically expressed her intent that the Marital Trust would be part of the Revocable Trust. Once this blending occurs, there is no reason why Item Second should be interpreted to direct nonreimbursement for taxes from the Marital Trust, but not nonreimbursement from the Revocable Trust.

The Daughters offer out-of-state cases *In Re Estate of Cline,* 258 Kan. 196, 898 P.2d 643 (1995), and *Whitbeck v. Aldrich,* 341 Mass. 326, 169 N.E.2d 882 (1960), to support their contention that the term "general assets of my estate" does not generally mean trust assets subject to a power of appointment. Both of these cases are distinguishable.

In *Cline,* the residuary beneficiaries of an estate also sought to apportion estate taxes over the entire gross estate pursuant to an apportionment statute. The decedent had a power of appointment over a marital trust, and her will directed that all taxes be paid "out of my general estate as part of the expense of the administration thereof with no right of reimbursement from any recipient of any such property." *Cline,* 898 P.2d at 645. The decedent exercised her power of appointment and directed that one-fifth of the principal and undistributed income in the trust go to the residuary beneficiary, and four-

fifths to parties unrelated to the decedent. The parties disputed what the decedent meant by "my general estate," and the court interpreted it to mean "residuary estate." Quoting a Pennsylvania case, the *Cline* court reasoned:

> "The phrase 'general estate' is customarily used as meaning the entire estate held by a person in his individual capacity. If he holds property in some other capacity, such as, e.g., a trustee, or if he has the testamentary power to dispose of some other property by appointment, that other property is not a part[ ] of his 'general estate.' "

*Id.* at 648 (quoting *Shipley's Estate (No. 2),* 337 Pa.580, 12 A.2d 347, 349 (1940)). The *Cline* court also quoted a line of New York cases holding that the term "general estate" usually means the residuary estate. *See id.* at 647. Based on these cases, the Kansas court concluded:

> The term "general estate" in the will provision directing that all taxes imposed by reason of her death, whether or not such property passes under the will or otherwise, should be paid out of the testatrix' "general estate," means that the taxes due by reason of the testatrix' death are to be imposed on the residuary estate.... If Article I of Cline's will was interpreted as residuary beneficiaries suggest, the tax exoneration clause in Article I becomes meaningless.

*Id.* at 649.

We see two crucial differences between *Cline* and this case. First, the decedent's will in *Cline* did not contain the language in Item Fifth of Rose's will, specifying that the "rest, residue and remainder of [her] estate" included "all assets which are subject to my power of appointment pursuant to the Marital Trust[.]" Even if we were to follow the *Cline* and New York rule that "general estate" usually means "residuary estate," we think that Rose's language in Item Fifth makes it clear that when she directed that the taxes be paid from the "general assets of my estate," she intended to include the Marital Trust among those assets. In other words, she expressed a clear intent to deviate from the usual meaning of the term "general assets of my estate." Second, the testator in

*Cline* did not explicitly express her intent, as Rose did in her Revocable Trust, that estate taxes should be paid from that trust. Nor did *Cline* address an analogous situation involving the testator's direction that the revocable trust was to contain all of the assets from a marital trust.

The will in *Whitbeck* provided that

[a]ll estate, inheritance, legacy, succession or transfer taxes ... with respect to all property taxable ... by reason of my death whether or not such property passes under this will and whether such taxes be payable by my estate or by any recipient of any such property, shall be paid by my executor out of my general estate ... with no right of reimbursement from any recipient of any such property.

*Whitbeck*, 169 N.E.2d at 883. The residuary beneficiaries argued that the decedent, in her tax clause, did not intend to refer to taxes attributable to the Marital Trust over which she held a power of appointment, but rather to refer only to the taxes "imposed upon the passing of her own property." *Id.* at 884. The *Whitbeck* court held that:

Nothing in Emily's will itself shows that the words in the tax clause were not used in their ordinary sense. We may not depart from that sense to give effect to what may be guessed was her intention.

*Id.* (citation omitted).

In contrast to *Whitbeck*, we do have words suggesting that the phrase "general assets of my estate" was not limited, as it ordinarily may be, to Rose's residuary estate. Rather, as we explained above, in Item Fifth of her will, and Article VII of her Revocable Trust, Rose made clear that she intended that the taxes would be paid from the Revocable Trust, which expressly included the Marital Trust.

The Daughters view the language in Article VII of Rose's Revocable Trust differently. They argue:

[W]hen Rose Posner's Will and Revocable Trust are read together, she directed [David], as Trustee of the Revocable Trust, to follow the instructions of [David], as Personal Representative, with respect to the payment of estate taxes.

As Personal Representative, [David] was bound by Item SECOND of his mother's Will not to seek reimbursement from the "marital trust."

We are not persuaded by this argument for the same reasons explained above—our interpretation of Items Second and Fifth of Rose's will. Rose drew no distinction in her will or her Revocable Trust between the assets of the Marital Trust, the assets held in her probate estate, and the assets transferred to her Revocable Trust during her lifetime. At her death, they were to be held in one pot, and disposed of according to the terms and conditions of the Revocable Trust.

### The Trial Court's Interpretation Of Rose's Will Does Not Render Item Two Meaningless

Citing *Johnson*, the Daughters next invoke the rule that " 'words in a will are never to be rejected as meaningless or repugnant if by any reasonable construction they may be given effect and made consistent and significant.' " *Johnson*, 283 Md. at 654, 392 A.2d 1103 (quotation marks and citations omitted). They argue that Rose's direction in Item Two that the Personal Representative does not have the "right of reimbursement ... [for estate taxes] from any person or corporation" has no meaning if it is not applied to exempt the Marital Trust from liability for any estate taxes, because the will makes no other bequests. We disagree, and find the answer to this contention in the Revocable Trust.

██ Aside from charitable bequests, the Revocable Trust contains specific bequests to Rose's daughter-in-law (silver and $80,000), certain of her grandchildren (tangible property), her son David ($2,500,000), two friends ($10,000), and a trust for her sister ($100,000). Rose reiterated, in the Revocable Trust, her intent that her monetary bequests be made "net of any and all applicable ... taxes." We interpret Item Two in the will to mean that her specific bequests in the Revocable Trust shall be made free of any taxes. Thus, our interpretation does not render Item Two meaningless or violate the rule of construction.

## The Daughters Mistakenly Rely On Cases That Do Not Involve Application Of The Tax Apportionment Act

With his last words at oral argument, the Daughters' counsel exhorted us to carefully read *In Re Estate of Breault*, 29 Ill.2d 165, 193 N.E.2d 824 (1963), and we have done so. The decedent's probate estate in *Breault* was insolvent, and the dispute was whether assets over which he held a power of appointment were subject to creditor claims against his estate. The issue was "whether, by virtue of the manner in which [the decedent's] power of appointment was exercised, the appointive property became an asset of and passed through [the decedent's] estate." *Id.* at 826. Thus, *Breault* differs from this case because David is not contending that any portion of the Marital Trust became part of Rose's probate estate.

The Daughters appear to advance *Breault*, however, to defend against David's argument that Item Fifth of Rose's will created a "pot" which blended the Marital Trust with the residuary estate, and paid both to the Revocable Trust. In *Breault*, the will clause relied upon by the creditors provided:

"I give, devise and bequeath all the rest, residue and remainder of my property, of whatsoever character and wheresoever situate, be it real, personal or mixed, belonging to me at the time of my death, or over which I have the power of disposition: to Harold L. Feigenholtz ... Trustee[.]"

*Id.* at 826. Recognizing that "the intention of the donee to appoint to his own estate must be expressly stated or clearly implied," the *Breault* court refused to find that the appointive assets became part of the decedent's probate estate. *Id.* at 830. It further reasoned:

Some jurisdictions imply the intention where the testator masses, blends or merges, (as it is variously called,) his own personal property with the appointed property for all purposes (viz., payment of debts, taxes, legacies, etc.,) and it is the contention of the appellees that this was accomplished here by the third paragraph of [the decedent's] will. How-

ever, we do not find this to be so. The only test we have
found for determining whether there has been a blending of
the two estates sufficient to imply appointment to the
donee's estate is ... as follows: The mere fact that the
appointed estate is given to the same persons who take the
residue of a testator's individual estate is not the test to be
applied in determining whether there has been a blending of
the two estates, but the real test under our line of deci-
sion[s] is whether the testator has treated the two estates as
one for all purposes, and manifested an intent to commingle
them. Quite obviously, that test cannot be met here, for
[the decedent], by the first two paragraphs of his will
directed the payment of debts and taxes before any attempt
at blending or commingling occurred. Under the circum-
stances there cannot be said to have been the blending for
all purposes needed to imply the intent to appoint to his own
estate.

*Breault,* 193 N.E.2d at 830–831 (quotation marks and citations
omitted).

The Daughters would have us adopt the *Breault* reasoning
by analogy, and conclude that because Item Two of the will,
directing the payment of taxes, preceded Item Five, blending
the Marital Trust with the residue and directing the payment
of both to the Revocable Trust, Rose clearly elected to opt out
of the Tax Apportionment Act.

We are not persuaded by this argument because we consid-
er it inconsistent with the Court of Appeals' decision in
*Johnson,* which directs that an election out of the Tax Appor-
tionment Act must be "plainly stated." *See Johnson,* 283 Md.
at 649, 392 A.2d 1103. The *Breault* court followed precedent
requiring that the intention to blend the probate estate and
appointive assets must be "expressly stated or clearly im-
plied." 193 N.E.2d at 830. Thus, under that precedent, in the
absence of a clear statement, the estates will not be blended.
Here, we have the opposite presumption—in the absence of a
clear statement, the Tax Apportionment Act applies. In
addition, we have Rose's direction in Article VII of the Revo-
cable Trust that estate taxes shall be paid out of the Revoca-

ble Trust, if directed by the Personal Representative. This expression defeats the Daughters' contention that the placement of the tax clause before the clause blending the probate and appointive assets demonstrates that no taxes were to be paid from the blended assets.

The Daughters also rely on *Shriners Hosp. v. Citizens Nat'l Bank*, 198 Va. 130, 92 S.E.2d 503 (1956), a case similar to *Breault*, in which the court held that property over which the testator held a power of appointment was not subject to the payment of debts, expenses, and taxes. *Shriners* is distinguishable on several grounds. Like *Breault*, *Shriners* did not involve application of a statute comparable to the Tax Apportionment Act, and is distinguishable on that basis. The will in *Shriners* also contained particular language, not present here, indicating that when the testator spoke of "my general fund," he was referring to his probate estate. *See id.* at 510. Nor did the will in *Shriners* have language comparable to that contained in Item Fifth of Rose's will, or make a bequest of the appointive assets to a revocable trust, with language directing payment of taxes from that trust. *Shriners* also relied on language in the testator's will providing that, "In the event my estate is not sufficient to pay all the taxes ... and the various bequests made by me in this ... Will, ... then, ... the various bequests and trusts shall be reduced proportionately." *Id.* at 507. It considered that language indicative that the testator's "individual estate is the primary fund for that purpose." *Id.* at 510. Rose's will does not contain comparable language.

## Rose's Lack Of A Power Of Appointment Over The Marital Trust Did Not Deprive Her Of The Power To Direct Whether Taxes Would Be Paid From The Marital Trust Pursuant To The Tax Apportionment Statute

The Daughters would have us ignore, and treat as a nullity, all expressions in Rose's will about the Marital Trust, because this Court, in a prior case, determined that she did not possess a power of appointment over the Marital Trust. Vigorously, they assert that David "cannot cite a single case in the country

standing for the proposition that a testator's intent on tax apportionment or any other subject can be divined by referring to an invalid attempt to exercise a non-existent power."

 Although we have found no cases addressing precisely this issue, we are persuaded that Rose's expression of intent with regard to the treatment of the Marital Trust is not a nullity for purposes of the Tax Apportionment Act. In other words, the fact that she had no power to appoint the Marital Trust does not detract from her expression of intent as to the allocation and payment of taxes attributable to that trust for purposes of the Tax Apportionment Act. The crucial concept, ignored by the Daughters, is that Rose did not need to affirmatively direct payment of estate taxes from the Marital Trust. The Tax Apportionment Act directs such payment. Rather, we examine Rose's will and Revocable Trust only to see whether she took affirmative action to exempt the Marital Trust from these taxes. *See Johnson,* 283 Md. at 655, 392 A.2d 1103. Thus, her lack of power to appoint the Marital Trust assets is not controlling, because her authority to determine whether the Trust pays estate taxes derived not from the terms of the Trust, but from the Tax Apportionment Act.

### Interpreting The Will To Apportion The Taxes Does Not Rest On The Doctrine Of Mistake

 The Daughters argue that courts do not reform a will because of a mistake, and that David seeks to reform Rose's tax clause because it is inconsistent with her general intention to disinherit her Daughters. The Daughters posit that David's approach wrongly requires "a court to speculate what his mother would have done if she realized that . . . she had no power to take her husband's trust away from the three children[.]" They urge that "[t]he correct technique, as the *Johnson v. Hall* [C]ourt stated, is to discern what Rose Posner meant by the words she used in Item SECOND." "Judicial remaking of wills," the Daughters assert, "whether avowed or under the guise of interpretation and construction, involves abandonment of the Statute of Wills. ET § 4–102."

We do not agree that, in affirming the trial court, we are remaking Rose's will. Rather, we are performing interpretation and construction, not reformation. In asking us to look only at Item Second of the will, and interpreting that in isolation, the Daughters seek to have us ignore one of the most basic doctrines applicable to construction of a will or other document—that we look at the entire will, not selective words in a vacuum. *See Jacob,* 128 Md.App. at 451, 738 A.2d 904. The language in Item Second should not be taken in isolation, but should be interpreted in light of Item Five of the will and Article VII of the Revocable Trust. As previously discussed, these clauses, when interpreted together, make it clear that Rose intended that if David elected, the estate taxes were to be paid out of the Revocable Trust, including the assets of the Marital Trust.

To support their argument, the Daughters rely on *Frank v. Frank,* 253 Md. 413, 253 A.2d 377 (1969), and *Noble v. Bruce,* 349 Md. 730, 709 A.2d 1264 (1998). Again, these cases are distinguishable.

In *Noble,* the residuary beneficiaries alleged that an attorney negligently prepared the decedent's will so that all taxes would be paid out of the residuary estate, contrary to the decedent's intent. The will directed that taxes should be paid from the residuary estate. The residuary beneficiaries sued, claiming that the testator intended that taxes on a large block of stock bequeathed to other persons would be paid out of the stock itself. In support of this contention, they relied on a letter from the attorney to the testator pointing out the size of her "tax problem," and saying: "I am all the more pleased that we have made the decision to have the bulk of the ... stock pay its own share of that tax." *Noble,* 349 Md. at 736, 709 A.2d 1264. Although the testator later added codicils and a new will, all prepared by the defendant attorney, she did not change the clause regarding payment of taxes.

Applying a strict privity rule, the Court of Appeals affirmed the grant of a motion to dismiss, on the grounds that the residuary beneficiaries lacked standing to sue the law firm.

*See id.* at 753–58, 709 A.2d 1264. "Here, there is no admissible evidence contradicting the supposition that the testators intended their contractual relationships with their attorneys to benefit themselves in planning their estates[.]" *Id.* at 754, 709 A.2d 1264. The Court rejected the residuary beneficiaries' argument that they should be able to introduce extrinsic evidence that the testator's intent was different from that expressed in the will. *See id.* at 755, 709 A.2d 1264. This "result would clearly reform the will," because "[i]f the [residuary beneficiaries] were successful, the will would in effect be rewritten so that the taxes would not be paid out of the residuary estate." *Id.* at 755–56, 709 A.2d 1264.

*Noble* is easily distinguished. Unlike this case, in *Noble*, there was no language in the will that supported the plaintiffs' assertion that the tax should be paid out of the residuary trust. In *Noble,* the plaintiffs were trying to introduce extrinsic evidence to show intent to pay taxes elsewhere. We do not rely on extrinsic evidence here, but rather, specific language in Item Five of the will.[1]

In *Frank,* the issue was whether the decedent had the power to appoint the assets in a marital trust. On audit of the decedent's estate, the IRS disallowed the marital deduction for federal estate taxes, because the words of the spouse's will creating the marital trust were not sufficient to grant the decedent's spouse a general power of testamentary appointment. Missing from the will was language indicating a specific power to appoint the assets to her own estate or to her creditors. In an apparent effort to qualify for the marital deduction, the widow "filed a bill against those who would take in the absence of appointment for a declaration as to the nature and scope of the power of appointment," and "whether she 'has the power validly to appoint 50% of the trust [estate remaining at her death] to her estate or to her creditors.'" *See Frank,* 253 Md. at 414, 253 A.2d 377.

---

1. David did assert that we should consider the deposition testimony of the draftsman of the will. We do not rely on this extrinsic evidence, for as the Daughters assert, to do so would be inappropriate. *See Noble v. Bruce,* 349 Md. 730, 755–56, 709 A.2d 1264 (1998).

On appeal, the Court of Appeals held that the language used in the spouse's will was insufficient to create a general power of appointment because Maryland law required that the appointee be given a power to appoint to her estate or to her creditors.

> That the draftsman of the will used those words thinking they meant more than they did and do and intending that should is not controlling. Clear and ambiguous word[s] in a will must be given the meaning they customarily and normally have and it is from this meaning that the intent of the testator is to be found. An intent to permit a wife to whom an estate has been left in trust, rather than outright, to make a gift of the estate to herself or to her creditors could not lightly or readily be inferred from words that do not legally convey such a meaning. As the authors of Vol. 1, No. 1, of *Wills, Estates and Trusts,* [a publication of the Maryland State Bar Association] ... put it: "But are there many testators who, if presented with the choice, would voluntarily make a gift to their spouses' post-death creditors?"

*Id.* at 420, 253 A.2d 377.

Again, the Daughters want to ignore Item Five of the will. In holding that the Daughters must bear a proportionate share of the taxes attributable to the Marital Trust, we are not resting on Rose's general intent to disinherit them. We are relying, rather, on her stated intent in Item Second that taxes shall be paid from the general assets of her estate, her stated intent in Item Fifth that the Marital Trust shall be included in the "rest, residue, and remainder of [her] estate," and her stated intent in the Revocable Trust that taxes shall be paid from that Trust as directed by the Personal Representative.

## II.

### The Doctrines Of Estoppel And Unclean Hands Do Not Bar David's Claim For Tax Contribution

As an alternative path to reversing the judgments against them, the Daughters urge us to hold that David is barred

under the doctrines of judicial estoppel and unclean hands from asserting that they are obligated to reimburse him for the taxes paid. Addressing each argument in turn, we decline to do so.

### David Is Not Judicially Estopped From Asserting That The Marital Trust Bears Responsibility For Taxes

In the trial court, the Daughters argued that David should be judicially estopped from asserting that reimbursement for the taxes paid from Rose's estate should be made from the assets of the Marital Trust. The trial court, however, did not mention this issue in its decision granting summary judgment in favor of David. In this Court, the Daughters renew their estoppel argument, pointing out that we may determine an estoppel issue at any stage of litigation, including on appeal. *See, e.g., Eagan v. Calhoun,* 347 Md. 72, 88, 698 A.2d 1097 (1997)(Court of Appeals held *sua sponte* that appellee's claim was barred by judicial estoppel).

If, as in this case, the content of the statements in question is an undisputed matter of record, we ask whether the estoppel was legally warranted. *See WinMark Ltd. P'ship v. Miles & Stockbridge,* 345 Md. 614, 621, 693 A.2d 824 (1997). Judicial estoppel, also known as the "doctrine against inconsistent positions," and "estoppel by admission," prevents "a party who successfully pursued a position in a prior legal proceeding from asserting a contrary position in a later proceeding." *Roane v. Washington County Hosp.,* 137 Md.App. 582, 592, 769 A.2d 263, *cert. denied,* 364 Md. 463, 773 A.2d 514 (2001). "Maryland has long recognized the doctrine of estoppel by admission, derived from the rule laid down by the English Court of Exchequer ... that '[a] man shall not be allowed to blow hot and cold, to claim at one time and deny at another.'" *Eagan,* 347 Md. at 87–88, 698 A.2d 1097. Consequently, judicial estoppel "precludes a party who ... secured a judgment in his or her favor from assuming a contrary position in another action simply because his or her interests have changed." *Mathews v. Gary,* 133 Md.App. 570, 579, 758

A.2d 1019 (2000), *aff'd on other grounds,* 366 Md. 660, 785 A.2d 708 (2001)(quotation marks and citation omitted).

There are two important reasons for estoppel. First, the doctrine of judicial estoppel "rests upon the principle that a litigant should not be permitted to lead a court to find a fact one way and then contend in another judicial proceeding that the same fact should be found otherwise." *Id.* (quotation marks and citations omitted). Judicial estoppel ensures "the 'integrity of the judicial process' by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment[.]' " *New Hampshire v. Maine,* 532 U.S. 742, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968 (2001) (citation omitted). The Court of Appeals has explained that

[i]f parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed; the coercive process of the law, available only between those who consented to its exercise, could be set at naught by all. . . . It may accordingly be laid down as a broad proposition that one who, without mistake induced by the opposite party, has taken a particular position deliberately in the course of litigation, must act consistently with it; one cannot play fast and loose.

*WinMark Ltd. P'ship,* 345 Md. at 620, 693 A.2d 824 (internal quotations and citations omitted).

The second reason for estoppel is to protect the party seeking the estoppel. The Court of Appeals has recognized that in addition to protecting the judicial system, estoppel also preserves " 'the relationship between the parties to the prior litigation.' " *Id.* at 623, 693 A.2d 824 (citation omitted).

We recently described "the difference between judicial estoppel and equitable estoppel[.]" *United Book Press, Inc. v. Maryland Composition Co.,* No. 2637, Sept. Term 2000, 141 Md.App. 460, 786 A.2d 1, 2001 Md.App. Lexis 188, *14 (2001). "[T]he former focuses on the connection between litigants and the judicial system, and the latter focuses on the relationship between the parties." *Id.* at *14–

15, 786 A.2d 1. Nevertheless, Maryland courts frequently have addressed both concerns under the unified label of judicial estoppel. Indeed, both aspects of judicial estoppel are expressed consistently in judicial summaries of the doctrine. " '[A] party will not be permitted to occupy inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts and another will be prejudiced by his action.' " *Stone v. Stone,* 230 Md. 248, 253, 186 A.2d 590 (1962)(quoting 19 Am.Jur. *Estoppel* § 50); *see also Roane,* 137 Md.App. at 592, 769 A.2d 263 ("The gravamen of a judicial estoppel claim is one party's inconsistency prejudicing his or her opponent's case").

We acknowledge the different "judicial integrity" and "prejudice" concerns addressed respectively by the doctrines of judicial estoppel and equitable estoppel. Nevertheless, we see a significant relationship between the two concerns. We find the Supreme Court's recent discussion of these concepts in *New Hampshire v. Maine,* 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001), especially instructive. Outlining the inquiry that courts traditionally follow to determine whether a claim is barred under principles of judicial or equitable estoppel, the Court explained how equitable concerns about prejudice are substantively intertwined with concerns about judicial integrity.

[S]everal factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. *Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled[.]" Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity.* A third consideration is

whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. (Emphasis added.)

*New Hampshire v. Maine,* 532 U.S. at ——, 121 S.Ct. at 1815.

In this case, the Daughters point to three statements made in the Prior Litigation by counsel for David, which they characterize as "factually incompatible" with David's position in this case, *i.e.,* that the assets of the Marital Trust cannot be used to pay any taxes.[2] The Daughters acknowledge that the

---

**2.** The first excerpt cited by the Daughters is from David's answer to their cross-claim in the Prior Litigation:

> In the event the Court determines that Mrs. Posner did not have a general or limited power of appointment, the funds in the Marital Trust would be part of Nathan Posner's residuary Estate to be distributed in accordance with the terms of his Will. This outcome would impose an undue hardship on Mrs. Posner's Estate because her Estate would be assessed Estate taxes on the Marital Trust but the assets of such Trust would be unavailable to pay the resulting taxes as the Marital Trust would have passed to the residuary Trust created under Nathan's Will.

The second is from David's opposition to the Daughters' motion for summary judgment:

> However, if this result should occur, the trust corpus could be subject to tax in Rose's estate even though such corpus would pass through Mr. Posner's estate without his estate bearing the estate tax burden associated with the transfer of the trust corpus. This would cause an undue, unintended shifting of the estate tax liability to Rose's estate, even though the assets would pass to the three (3) children under the terms of Mr. Posner's Will. This result would be inequitable as Rose's estate would be liable for the estate tax obligations relating to a purported distribution from Mr. Posner's estate. Clearly, such a result is undesirable as the then intended beneficiaries of Rose, including certain charitable organizations, would then be deprived of their intended inheritance.

The third instance is from argument of David's counsel at the hearing on that motion:

> [I]f the Court says that the gross amount of the marital trust goes to the three children, then the result will be that that amount will still be includable on the current Federal return, Federal estate tax return that was filed, but with the tax, the $2,700,000 will have to come out of other assets that Mrs. Posner possessed at the time of her death.

David counters that the Daughters have taken these statements out of context, and points to qualifying language omitted from their excerpts. Given our conclusion that, as a matter of law, the Daughters cannot

trial court ruled against David in the Prior Litigation. They also concede that, in correspondence after that ruling, the court and counsel for all parties stated their mutual understanding that the tax contribution issue in this case had not been presented to or decided by that court.

In doing so, appellants recognize that they cannot establish the "acceptance" element of the standard model for estoppel. As the post-judgment correspondence establishes, the trial court did not even address the tax contribution question at issue in this case, much less decide that question on the basis of anything that David argued to it. Clearly, the court did not accept David's contentions as a factor in the decisions it did make, because it ruled against David.

Faced with an obvious hole in their estoppel case, appellants argue that it is of no significance, because acceptance by the prior tribunal is not a necessary ingredient for judicial estoppel in these circumstances.[3] Viewing the issue solely from the context of harm to the judicial system, they posit that allowing appellee to pursue this claim does enough harm to judicial integrity that estoppel is legally warranted.

In support, they cite a single Court of Appeals decision, which they contend establishes that the Court of Appeals has applied the doctrine of judicial estoppel without regard to "acceptance" by the prior tribunal or "prejudice" to the party

---

establish the acceptance necessary to estop David, we shall not resolve that dispute.

**3.** We note that the Daughters do not address the "prejudice" component of the estoppel inquiry, even though lack of prejudice can be reason to find that estoppel is not "legally warranted." The Court of Appeals has held that estoppel may not be warranted in certain circumstances when the party seeking the estoppel has not been prejudiced by the inconsistency in positions, and would reap an inappropriate windfall from an estoppel. In *WinMark Ltd. P'ship v. Miles & Stockbridge*, 345 Md. 614, 693 A.2d 824 (1997), the Court held that applying the doctrine of judicial estoppel to bar a legal malpractice claim that was not disclosed on the plaintiff's Chapter 11 bankruptcy schedules would inappropriately reward the defendants who allegedly committed the malpractice, and inappropriately penalize the innocent unsecured creditors who might benefit from the success of such a claim. *See id.* at 621–30, 693 A.2d 824.

asserting estoppel. Interpreting the Court of Appeals' opinion in *Eagan v. Calhoun*, they argue that "[i]t is significant that the Court of Appeals **did not even analyze whether or not [the party making the assertion] was successful** in the prior . . . action or whether [the other parties] relied on that [assertion]." (Emphasis in original.)

We do not agree that the decision or rationale in *Eagan* supports the Daughters' thesis. Specifically, we reject the notion that the *Eagan* Court disregarded the "acceptance by the prior tribunal" component of estoppel. To explain, we must examine that case in some detail, and then look to the Court's more recent description of the role that acceptance by the prior tribunal plays in establishing a factual basis for estoppel.

While Eagan's wife was standing on a ladder cleaning the roof gutters of their home, Eagan kicked the ladder out from under her, causing her to fall. Eagan did nothing to help her, instead letting her lie unattended for ten hours while he picked up their children, took them to a softball game, and denied knowing where his wife was. She died where she fell, sometime during Eagan's absence. Eagan eventually confessed to his crime, and entered a negotiated plea of guilty to voluntary manslaughter.

In anticipation of serving a five year sentence, Eagan placed his two children in the care of friends, who were given temporary custody with his consent. While Eagan was incarcerated, the guardian of the children's property filed a wrongful death suit against Eagan, on behalf of the children. Eagan argued to the trial court and the Court of Appeals that the children's claims were barred by parent-child immunity. In his testimony to the jury, Eagan disputed that the killing was intentional.

The Court of Appeals held that the slayer's rule, in addition to barring a person who commits a felonious and intentional killing from sharing in the decedent's estate or life insurance proceeds, also bars a parent-child immunity defense against a wrongful death claim. *See id.* at 85, 698 A.2d 1097. The

Court then proceeded to consider whether, as a matter of law, Eagan's conduct barred his immunity defense.

It explained that Eagan's guilty plea could not be used to establish the intentional killing required to abrogate parent-child immunity in the wrongful death case, because Eagan had disputed the nature of the killing in his testimony to the wrongful death jury. *See id.* at 86, 698 A.2d 1097 (disposition of criminal proceeding " 'is not [irrebuttably] conclusive of the character of the homicide' " in subsequent civil action determining whether killer is entitled to assets of the decedent) (citation omitted). Moreover, the jury's special verdict sheet in the wrongful death case did not clearly answer whether it found Eagan's conduct had been intentional. In the usual case, the Court noted, a new trial would be necessary to determine whether the killing was intentional. *See id.* at 86, 698 A.2d 1097.

But based on Eagan's position in a prior guardianship proceeding, the Court concluded that the doctrine of judicial estoppel barred him from contesting the intentional nature of the killing in the wrongful death case. *See id.* at 87–88, 698 A.2d 1097. The Court pointed out that Eagan had admitted in the collateral guardianship proceeding that the slayer's rule prevented him from taking title to his wife's one half interest in the home that the Eagans owned as tenants by the entireties. In a memorandum of law addressing the nature of Eagan's interest in the marital home, Eagan conceded the killing "constituted voluntary manslaughter and was therefore intentional." *Id.* at 88, 698 A.2d 1097. Eagan had attached this memorandum to his affidavit in the wrongful death case.

The Court of Appeals held that Eagan's admission in that memorandum that the killing was intentional estopped him from taking a contrary position in the wrongful death case. *See id.* The Court reasoned that, "[a]t the very least, the force of that estoppel allows the plea of guilty to stand unrebutted and thus to establish that the killing was a voluntary manslaughter." *Id.* Given the intentional nature of the felonious killing, the Court held that the slayer's rule prevent-

ed Eagan from asserting a parent-child immunity defense. *See id.* at 88, 698 A.2d 1097.

The Daughters correctly note that the *Eagan* Court did not discuss whether the court in the guardianship matter had "accepted" Eagan's statement. Given the circumstances under which Eagan made that statement, however, we attach no significance to the absence of an "acceptance" analysis in the Court's opinion.

As the Court of Appeals recognized, Eagan's statement was an *admission of fact* (*i.e.*, "I intentionally killed her") to the prior tribunal. Consequently, there is no doubt that the guardianship court "accepted" that representation when it determined that the wife's interest in the marital home did not pass to Eagan as the surviving tenant by the entirety, but passed instead to the children under the slayer's rule. Eagan's statement was a classic instance of "estoppel by admission." .

For these reasons, we reject the Daughters' interpretation of *Eagan* as a *sub silentio* authorization to apply the doctrine of judicial estoppel without regard to whether the statement in question was accepted by the tribunal to which it was offered. To the contrary, the Court of Appeals more recently noted, in describing the elements of judicial estoppel, that "[t]he application of judicial estoppel requires ... that the 'prior inconsistent position must have been accepted by the court[.]' " *Pittman v. Atlantic Realty Co.*, 359 Md. 513, 529 n. 9, 754 A.2d 1030 (2000)(quoting *Sedlack v. Braswell Svcs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir.1998)).

The Daughters do not point us to any Maryland case in which a party was estopped on the basis of a statement that was not accepted by the judicial entity to which it was made. We recognize that determining the extent to which a party is bound by affirmative statements made in pleadings "must necessarily depend upon the circumstances peculiar to each case." *Kramer v. Globe Brewing Co.*, 175 Md. 461, 467, 2 A.2d 634 (1938). Our review of the Maryland case law, nevertheless, suggests that assertions that do not serve as the basis for

any judicial relief generally are not sufficiently prejudicial to either the judicial system or to the party seeking the estoppel to establish a factual basis for estoppel. *Compare, e.g., Tricat Indus., Inc. v. Harper,* 131 Md.App. 89, 109, 748 A.2d 48, *cert. denied,* 359 Md. 334, 753 A.2d 1032 (2000)(because parties to prior case left validity of contract issue for decision by another court, there was "no factual basis for the imposition of estoppel"); *Roane,* 137 Md.App. at 593, 769 A.2d 263 (because plaintiff did not rely on defendants' argument that a forum selection clause mandated state court jurisdiction, defendants were not estopped to subsequently challenge jurisdiction of circuit court) *with Stone,* 230 Md. at 253–54, 186 A.2d 590 (because husband admitted in letters and documents pertaining to administration of wife's estate in Maine that certain assets were part of a trust, he was estopped from claiming that they were part of wife's estate that passed to him); *Kramer,* 175 Md. at 471–72, 2 A.2d 634 (because employer obtained dismissal of employee's claim on grounds that employee had only a worker's compensation remedy, employer was estopped to deny that it employed employee); *Nam v. Montgomery County,* 127 Md.App. 172, 190–91, 732 A.2d 356 (1999)(because court dismissed "John Doe, M.D." with prejudice upon plaintiffs' request, at a time when they knew his identity, plaintiffs were estopped to later amend claim to add him as a defendant); *Wilson,* 118 Md.App. at 216–17, 702 A.2d 436 (because plaintiff and his attorney successfully settled litigation against person whom they both knew had not injured plaintiff, plaintiff was estopped from asserting legal malpractice claim against attorney for missing the statute of limitations on claim against real tortfeasor).

Moreover, we agree with the Supreme Court that an inquiry into whether the judicial statement in dispute was accepted by the prior tribunal is critical to determining whether estoppel is warranted in order to preserve judicial integrity. Accordingly, even if David's position in the Prior Litigation over Rose's estate could be construed as inconsistent with his position in this tax contribution case, we would still hold that David is not judicially estopped by it, because he did not obtain any judicial

relief based on any statements that he made to the trial court in that case. In these circumstances, "judicial acceptance of an inconsistent position in [this] later proceeding would [not] create 'the perception that either the first or the second court was misled[.]' " *New Hampshire v. Maine,* 532 U.S. at ——, 121 S.Ct. at 1815. "Absent success in [the] prior proceeding," David's assertion in this litigation that the Marital Trust must contribute to the payment of taxes "introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity." *Id.* Accordingly, we find "no factual basis for the imposition of estoppel." *Tricat Indus.,* 131 Md.App. at 109, 748 A.2d 48.

## There Are No Facts Justifying Application Of The Doctrine Of Unclean Hands

The Daughters argue that David's improper payment of estate taxes attributable to the Marital Trust bars him from equitable relief against his sisters under the doctrine of unclean hands. Characterizing his payment of these taxes as a "mistake," the Daughters assert that "[h]is hands are hardly clean, and the result in a purely equitable matter, such as contribution, is that he cannot profit from his own mistake at the expense of someone who is wholly innocent." The equitable doctrine of unclean hands is designed to "prevent the court from assisting in fraud or other inequitable conduct...." *Adams v. Manown,* 328 Md. 463, 482, 615 A.2d 611 (1992); *see Hicks v. Gilbert,* 135 Md.App. 394, 400, 762 A.2d 986 (2000). If it finds no facts in the record disclosing inequitable conduct, however, an appellate court can rule that the maxim is inapplicable as a matter of law. *See Hlista v. Altevogt,* 239 Md. 43, 48, 210 A.2d 153 (1965). We do not agree that the payment of these taxes, even if mistaken, constitutes inequitable conduct justifying invocation of the doctrine of unclean hands.

Pressing their equitable estoppel argument, the Daughters argue that there was no valid reason for David to pay taxes when he did, and that he did so only to further his litigation position, advanced in the Prior Litigation, that Rose held a testamentary power of appointment over the Marital Trust.

David responds that he paid the tax because he believed it was due, and that he faced the real threats of interest and a penalty for non-payment under federal tax law. *See* 26 U.S.C. § 6662. The Daughters counter that any assessed interest would be offset by the increase in value of the equities held by the Marital Trust, and the deduction against estate taxes authorized under IRS Rev.Rul. 79–252, 1979–2 C.B. 333, 1979 WL 51157. With respect to a penalty, the Daughters say that David could have avoided any penalty by invoking the "reasonable cause exception" under 26 U.S.C. section 6664(c), and simply disclosing the Prior Litigation.

We conclude that, given his responsibilities as Personal Representative, and in light of the potential for assessment of a penalty, David did not act inequitably in paying the taxes attributable to the Marital Trust. We explain.

At the time he paid the tax, David was in litigation with the Daughters over the issue of whether Rose held a testamentary power of appointment over the Marital Trust. If Rose did hold such power, as David asserted, then her estate was required to include the Marital Trust in her taxable estate, and pay federal estate taxes attributable to that trust, within nine months of Rose's death. *See* 26 U.S.C. §§ 2041(a)(2)(gross estate includes the value of assets over which the decedent exercised or released a general power of appointment); 26 U.S.C. § 6075 (estate tax returns must be filed within 9 months of death); 26 U.S.C. § 6151(a)(tax is due at the time fixed for filing return); 26 U.S.C. § 6601 (interest charged on taxes not paid by last date prescribed for payment); 26 U.S.C. § 6662 (penalty for certain under-payments). The inclusion of the Marital Trust in Rose's estate was consistent with the position that had been taken in Nathan's estate with respect to the Trust. Rose, as Nathan's personal representative, had obtained a deferral of such taxes by claiming a "marital deduction" under 26 U.S.C. section 2056, based on the assertion that Rose had an inter vivos or testamentary power of appointment. *See* 26 U.S.C. § 2056(b)(5); Tech. Adv. Mem. 120768–01 (July 16, 2001).

As personal representative of Rose's estate, David was responsible for the payment of federal estate taxes. *See* 26 U.S.C. § 2002. The obligation to pay the tax extends to all persons who hold or receive property included in the taxable estate, including holders of appointive property. *See* 26 U.S.C. § 6324. If an underpayment of tax was attributable to "[n]egligence or disregard of rules or regulations," the IRS could have assessed a penalty, which would have been added to the tax liability. *See* 26 U.S.C. § 6662. The amount of the penalty is twenty percent of the underpayment. *See* 26 U.S.C. § 6662(a). In this case, the penalty could have amounted to approximately $540,000.

Under the "reasonable cause exception," however, no penalty is imposed "if it is shown that there was a reasonable cause [for the underpayment] and that the taxpayer acted in good faith . . ." 26 U.S.C. § 6664(c)(1). The problem for a taxpayer, however, is that often he cannot know in advance whether there was "reasonable cause" for an underpayment, because that is a judgment call, first for the IRS, and then for the courts. A safer course for a taxpayer who is in doubt is to pay the tax when due, and then seek a refund pursuant to 26 U.S.C. section 6402.

The issue presented here is not whether the tax was due, or even whether the IRS would have assessed a penalty against David for underpayment. Rather, we must decide whether David acted inequitably in avoiding the risk by paying the tax, knowing that if he lost in the Prior Litigation, he could seek a refund on the grounds that Rose had no inter vivos or testamentary power of appointment. We do not see any basis for holding that David's course of action was inequitable, when payment of the additional tax protected Rose's estate and the trust beneficiaries against a potential penalty, and David had a viable method to seek a refund if the Maryland courts determined that Rose had no power of appointment over the Marital Trust.[4]

---

4. We see little pressure placed on David as a result of the prospect of paying interest. As the Daughters correctly point out, interest paid on

The Daughters suggest that the refund procedure is not a reasonable alternative because the IRS acts aggressively and with partiality in denying refund claims. It may be true that the IRS acts aggressively in asserting taxpayer liability. There are, however, rights of appeal to the Tax Court, and from there to the federal appellate courts. *See* 26 U.S.C. § 7482 (review of Tax Court decisions by United States Courts of Appeal). The appellate process safeguards the integrity of the refund process.

David, at oral argument, indicated his willingness to pursue a tax refund in the federal courts. There is no danger, however, that David will recover both from the Daughters and the IRS. If the tax is recovered from the IRS, the amount recovered must be paid to the respective beneficiaries pro rata, in accordance with the amount contributed and their respective interests in the Marital Trust.

■■■ Nor are we persuaded by the Daughters' argument that David has unclean hands because he paid the tax without requesting the Daughters to indemnify him from interest and penalties for an underpayment. A personal representative facing a potential tax liability has no obligation to seek the indemnification of the beneficiaries before paying that tax.

### We Do Not Reach David's Alternative Arguments In Support Of His Claim For Contribution

In light of our holdings set forth above, we do not reach the remaining arguments raised by David to support his claim for contribution.

### III.

### The Trial Court Did Not Abuse Its Discretion In Denying Pre-judgment Interest

■■■ David filed a cross-appeal from the trial court's denial of pre-judgment interest on the estate taxes for which he

---

estate tax liabilities is deductible, and the deduction, in effect, reduces the amount of interest paid. *See* Rev.Rul. 79–252, 1979–2 C.B. 333, 1979 WL 51157.

sought contribution. "The general rule is that interest should be left to the discretion of the jury, or the [c]ourt when sitting as a jury." *I.W. Berman Props. v. Porter Bros., Inc.,* 276 Md. 1, 18, 344 A.2d 65 (1975) (quoting *Affiliated Distillers Brands Corp. v. R.W.L. Wine & Liquor Co.,* 213 Md. 509, 516–517, 132 A.2d 582 (1957)). This general rule, however, is subject to certain exceptions.

■■■ David argues that this case falls into the class of cases for which pre-judgment interest should be available as a matter of right, under the analysis of *Buxton v. Buxton,* 363 Md. 634, 656, 770 A.2d 152 (2001). The Daughters, also citing *Buxton,* respond that when "there is a legitimate dispute between the parties, unlike the case of a suit on a simple promissory note," pre-judgment interest is a matter of discretion for the trier of fact. We agree with the Daughters.

*Buxton* recognized three rules regarding pre-judgment interest.

Pre-judgment interest is allowable as a matter of right when "the **obligation to pay** and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date." *First Virginia Bank v. Settles,* 322 Md. 555, 564, 588 A.2d 803 (1991).... As we explained in *I.W. Berman Prop. v. Porter Bros.,* [276 Md. 1, 16–17, 344 A.2d 65 (1975),] the right to pre-judgment interest as of course arises under written contracts to pay money on a day certain, such as bills of exchange or promissory notes, in actions on bonds or under contracts providing for the payment of interest, in cases where the money claimed has actually been used by the other party, and in sums payable under leases as rent. Pre-judgment interest has been held as a matter of right as well in conversion cases where the value of the chattel converted is readily ascertainable.... On the other hand, in tort cases where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise

measurement, the award itself is presumed to be comprehensive, and pre-judgment interest is not allowed.... Between these poles of allowance as of right and absolute non-allowance is a broad category of contract cases in which the allowance of pre-judgment interest is within the discretion of the trier of fact.

*Id.* at 656–57, 770 A.2d 152 (some citations omitted)(emphasis added).

In some tax apportionment cases, the obligation might be certain, and the amount settled at the time the tax is paid. Here, however, although the amount of the tax was certain, the obligation to pay was not certain until the date of judgment. This uncertainty was due to the peculiarities of the Marital Trust in Nathan's will, which in turn caused uncertainty over whether the tax was due, and the legitimate dispute over the interpretation of Rose's will.

The Court of Appeals in *Buxton,* quoting its decision in *First Virginia Bank v. Settles,* 322 Md. 555, 564, 588 A.2d 803 (1991), said that interest is only recoverable as a matter of right when the "**obligation to pay** and the amount due had become certain, definite, and liquidated[.]" *Buxton,* 363 Md. at 656, 770 A.2d 152 (emphasis added). The highlighted language suggests that a right to pre-judgment interest only exists when liability **and** damages are certain, and thus supports the Daughters' contention.

■■■■ David does not direct us to any cases like this one, in which the amount was certain, but the liability uncertain. We have found only limited precedent for such circumstances. Based on the framing of the rule in *First Virginia Bank,* and the holding in *A. & A. Masonry Contrs., Inc. v. Polinger,* 259 Md. 199, 203–04, 269 A.2d 566 (1970), discussed below, however, we conclude that even when the amount is certain, a legitimate dispute as to the obligation to pay deprives the claimant of an absolute right to interest, and places the case into that category where interest is discretionary with the fact-finder.

*A. & A. Masonry Contractors* was a suit on a construction contract, in which the plaintiff was awarded damages based on the specific amount of the written contract, but was denied a claim for $9,382.42 extra because the claimed extra was included in the contract price. The plaintiff appealed, claiming, *inter alia,* that the trial court erred when it declined to award pre-judgment interest. The Court of Appeals held that the trial court did not err in denying such interest, citing the general rule that "[o]rdinarily the matter of interest is left to the discretion of the jury or the court sitting without a jury." *Id.* at 204, 269 A.2d 566 (quotation marks and citation omitted). Although the opinion did not explain why the case fell within the "discretion of the jury" category, the Court of Appeals later offered an explanation when, in *I.W. Berman,* it characterized its holding in *A. & A. Masonry Contractors.* There it described the case as

[holding] in a suit by the appellants for labor and materials furnished in connection with the construction of an apartment-hotel, that the trial court had not abused its discretion "in not including interest on the sums he allowed in the judgment" in view of the dispute between the parties as to whether the amount for which damages were claimed was encompassed within the contract of the parties, or whether it had been performed as an "extra" in the course of construction.

*I.W. Berman Props.,* 276 Md. at 18–19, 344 A.2d 65. Thus, the Court excluded the case from the "interest by right" category because the obligation to pay the claimed extra was disputed. Although the dispute involved the extent of damages, at issue was not the amount, but rather, whether the defendant had any liability for materials and labor outside the contract price.

In this case, the trial court resolved the uncertainty as to the Daughters' liability for contribution with a judgment in favor of David, and we will affirm its decision. Because of the legitimate dispute over the Daughters' liability, however, we

hold that the trial court had discretion whether to award pre-judgment interest.[3] We see no abuse of discretion.

### Conclusion

For the reasons set forth above, we hold that the Tax Apportionment Act applied to Rose's will because she did not "plainly state" an intention to opt out of it. *See Johnson,* 283 Md. at 649, 392 A.2d 1103. Under that statute, the Daughters must each bear one third of the federal and state estate taxes, and are liable to David for contribution for the taxes paid. The trial court acted within its discretion in declining to award pre-judgment interest. Accordingly, the judgment of the circuit court is affirmed.

**JUDGMENT AFFIRMED. COSTS TO BE PAID ⅔ BY APPELLANTS/CROSS–APPELLEES, ⅓ BY APPELLEE/CROSS–APPELLANT DAVID POSNER.**

---

**3.** David argues only that he is entitled to interest as a matter of right. Although this case was decided on summary judgment, he makes no claim that we should remand to the trial court for a determination of interest after a factual hearing.