*Paul W. Nusbaum, Jr. v. Marsha R. Nusbaum et al.*, No. 0480, September Term 2018. Opinion by Wells, J.

**FAMILY LAW – CHILD SUPPORT – ALIMONY – ARREARAGES – ALLOCATION OF SUPPORT PAYMENTS – SEPARATION OF POWERS**

Paul Nusbaum is subject to an Earnings Withholdings Order by the Carroll County Office of Child Support Enforcement ("OCSE") for child support and alimony payments to his former wife. OCSE prioritizes each payment first toward current child support obligations, then toward current alimony obligations, and finally toward arrearages of both. Mr. Nusbaum asked the circuit court to order OCSE to reallocate his past alimony payments toward child support, and to credit his future payments entirely toward current child support and child support arrears before any alimony. OCSE's allocation of payments finds support in both Maryland and federal law. Accordingly, separation of powers precludes the court from interfering with OCSE's allocation structure, which is a lawful exercise of its administrative authority and discretion.

Circuit Court for Carroll County
Case No. 06-C 03-039838

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0480

September Term, 2018

_____

PAUL W. NUSBAUM, JR.

v.

MARSHA R. NUSBAUM, ET AL.

_____

Nazarian,
Wells,
Adkins, Sally D.
    (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Wells, J.

_____

Filed:  December 20, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Appellant, Paul Nusbaum, asked the Circuit Court for Carroll County to order the Carroll County Office of the Maryland Child Support Administration to reallocate the money he had previously paid for child support and alimony solely to his child support account. After a hearing on the issue, the circuit court ruled that Mr. Nusbaum was judicially estopped from the requested reallocation because Mr. Nusbaum had previously claimed part of the money as "alimony paid" and taken an income tax deduction. Consequently, the court ruled that he could not re-characterize those payments exclusively as child support.

Mr. Nusbaum took a timely appeal and presents two questions for our review:

1. Did the circuit court err in declaring that Mr. Nusbaum was judicially estopped from claiming that the amounts he claimed as alimony on his tax returns should be reallocated toward his child support arrears with the [Carroll County Office of Child Support Enforcement (OCSE)]?

2. Did the Circuit Court err in not reaching a decision as to whether the allocation of support funds paid to a former spouse should be first paid to current child support and child support arrears, prior to any payment of funds toward spousal support?

We hold that although the circuit court erred in its application of judicial estoppel to prevent the reallocation, the circuit court could not have legally ordered the reallocation in any event. We, therefore, affirm the circuit court.

FACTUAL AND PROCEDURAL BACKGROUND

When they divorced in 2005, the Circuit Court for Carroll County ordered Paul Nusbaum to pay his former wife, Marsha Nusbaum, $3,250.00 per month in non-modifiable alimony. Mr. Nusbaum was also ordered to pay Ms. Nusbaum $1,422.00 per month in child support for the benefit of their four children. At Ms. Nusbaum's request, Mr. Nusbaum was required to pay both sums via an Earnings Withholding Order through the Carroll County Office of Child Support Enforcement ("OCSE"), the local branch of the Maryland Child Support Administration ("MCSA"), the state agency charged with collecting child and spousal support.

Around 2008, Mr. Nusbaum moved to Georgia. The OCSE duly registered the Earnings Withholding Order in Georgia, obligating Georgia to collect Mr. Nusbaum's alimony and child support payments and forward them to Maryland.

It is important to note that during this time, although Mr. Nusbaum's wages were garnished, he did not pay the full monthly amount of either child support or alimony because what he earned could not fully satisfy either obligation. Consequently, by 2010, when Mr. Nusbaum asked the court to modify his monthly child support payment, he owed $36,264.60 in unpaid child support and $117,127.22 in unpaid alimony. Nevertheless, because of the emancipation of two of the Nusbaums' children, the court reduced his child support payment to $941.00 per month from January 2010 through August 2010, at $835.00 per month for September 2010, and established the child support payment at $929.00 per month starting in October 2010.

Sometime in early 2016, Mr. Nusbaum noticed that Georgia allocated his monthly payments differently from Maryland. Whereas Maryland declared his child support arrears were $80,905.25, Georgia said his child support arrears were approximately $30,000.00. Mr. Nusbaum discovered that this was because Georgia allocated a higher percentage of his monthly payment to child support, rather than alimony. Maryland did almost the opposite, allocating 70% of his payments to alimony and 30% to child support. Armed with this information, Mr. Nusbaum returned to Maryland.

On April 16, 2016, Mr. Nusbaum filed a motion asking the circuit court to order OCSE to do an audit and establish his arrears for both alimony and child support. Mr. Nusbaum also requested the court to modify his on-going child support payment because another of the Nusbaums' children had emancipated.[1] At a hearing before a Magistrate, Mr. Nusbaum argued that the circuit court should order OCSE to perform an audit to determine exactly how much he had paid for both obligations. After the audit, he wanted OCSE to credit all the money he paid be put toward his child support obligation until that obligation was satisfied. Only then, so Mr. Nusbaum argued, should any excess amount be credited against his alimony obligation. Ms. Nusbaum opposed the reallocation request.

The Magistrate, in a written set of findings, reduced Mr. Nusbaum's on-going monthly child support obligation to $481.00 per month, plus $120.25 toward his arrears, due to the emancipation of one of the children. More importantly, the Magistrate determined that the circuit court did not have the authority to: (1) order OCSE to perform

---

[1] This left the Nusbaums with one minor child subject to a child support order.

3

an audit, nor, (2) order OCSE to reallocate Mr. Nusbaum's prior total payments to exhaust his child support obligation before satisfying his alimony obligation. "Your Magistrate reviewed the statutes cited by the parties, testimony presented, Plaintiff's Exhibit 3, and [case cited], and finds that there is no authority given to this Court to alter the Audit in the manner requested by [Mr. Nusbaum]." Surprisingly however, the Magistrate recommended "that upon entry of this Order, that child support current and arrearage payments should be given priority over the alimony obligation, as it is in the best interests of the parties' minor child." OCSE filed Exceptions to the Magistrate's recommendations.

At the Exceptions hearing, the attorneys for OCSE[2] and Mr. Nusbaum set forth their positions. Mr. Nusbaum wanted all past payments to Ms. Nusbaum reallocated to satisfy his child support obligation first, rather than be apportioned between alimony and child support, as OCSE had done. Additionally, he wanted any future payments apportioned to first satisfy child support, then child support arrears, and alimony last. In Mr. Nusbaum's view, it was in the children's best interests to prioritize the allocation of payments in this way.

Ms. Nusbaum and OCSE disagreed. The attorney for OCSE noted that Mr. Nusbaum desired the reallocation because Georgia was "coming after" him for not making full payments to either child support or alimony. More importantly, OCSE's counsel explained that under current procedures, child support and spousal support are given equal priority, as the payments are for the benefit of the children and the former spouse.

_____

[2] In Carroll County, an attorney in the Office of the State's Attorney acts as counsel for the OCSE.

4

Additionally, counsel for OCSE explained that it would be too onerous for them to have to manually adjust each monthly payment and apportion it solely to child support.

Seven days after the hearing, in an oral ruling, the judge "grudgingly" found that the Magistrate erred. The judge, essentially, agreed with Mr. Nusbaum and ordered OCSE to perform an audit and "allocate and prioritize all payments first and foremost to the child support obligation as well as any child support arrears." "Any other remaining payments… shall then be credited towards [Mr. Nusbaum's] alimony obligation and any outstanding arrearage."

Ms. Nusbaum immediately filed a motion to alter or amend the court's order. Simultaneously, OCSE filed a motion to reconsider. Ms. Nusbaum argued that there was no evidence presented at the hearing to suggest that the ordered reallocation was in the children's best interests, as Mr. Nusbaum claimed. Additionally, both Ms. Nusbaum and OCSE argued that the circuit court should reverse itself because the reallocation was contrary to "Maryland [l]aw and federal and state regulations regarding child support." OCSE specifically argued that the court's order placed OCSE in direct violation of federal law, since they were obligated pursuant to federal statutes and the state's "distribution matrix" to collect spousal and child support without prioritizing one over the other. Mr. Nusbaum opposed altering the court's order in any way.

The court held a hearing on Ms. Nusbaum's motion to alter or amend judgment and OCSE's motion to reconsider, after which the court took the matter under advisement. Later, the court issued an "Opinion and Order" which was a legal analysis of the arguments advanced at the motions hearing. For reasons not entirely clear, the court re-evaluated Ms.

5

Nusbaum's request for counsel. The record is ambiguous as to whether the court denied her request or found it to be moot. In any event, the record is clear that Ms. Nusbaum was represented by counsel at the motions hearing. The court also revisited its in-court ruling denying Ms. Nusbaum's request to allow expert testimony at the hearing. The court determined that it properly excluded expert testimony.

In its analysis of what the court termed "Motion 2," the reallocation issue, the judge admitted that at the end of the Exceptions hearing he was "uncomfortable" ordering OCSE to perform an audit and reallocate Mr. Nusbaum's payments giving priority to satisfying his child support obligation. The judge recalled that he found OCSE's allocation method, giving equal priority to spousal and child support, to be "inconsistent with the best interests of the child standard." Based on his reasoning at that time, the judge concluded that Mr. Nusbaum could not be "estopped" from getting what he wanted. Now, the judge noted that at prior hearings on Mr. Nusbaum's requests to modify child support, Mr. Nusbaum provided his income tax returns. The judge found that on those tax returns, Mr. Nusbaum "claimed a deduction from taxable income, the amount of alimony deemed 'paid' by [OCSE]."

> In other words, he benefited from an income deduction based upon the very method of alimony payment allocation he now seeks to challenge. Indeed, he secured prior reductions of child support based upon his stated income at the time – which had been adjusted based upon a deduction for alimony paid. If he truly felt that all payments should have been applied to child support first as he now contends, then it is wholly inconsistent to take a corresponding deduction for alimony paid in prior tax returns. In short, it appears to the Court that Mr. Nusbaum is trying to "have his cake and eat it too."

6

After reviewing the holdings of several cases, the judge concluded that Mr. Nusbaum was judicially estopped from seeking to reallocate past and future child support payments and have them take priority over his alimony obligation.

Significantly, the judge did not answer the question of whether the court had the authority to order OCSE to reallocate payments in the manner that Mr. Nusbaum requested. Rather, the judge concluded that as Mr. Nusbaum was estopped from making the request, this threshold question would "have to await another day."

## STANDARD OF REVEIW

We review the circuit court's decision using an abuse of discretion standard. "In general, the denial of a motion to alter or amend a judgment is reviewed by appellate courts for abuse of discretion." *RRC Northeast, LLC v. BAA Maryland, Inc*., 413 Md. 638, 673 (2010) (citing *Wilson–X v. Dep't of Human Res*., 403 Md. 667, 674–75 (2008)). "The relevance of an asserted legal error, of substantive law, procedural requirements, or fact-finding unsupported by substantial evidence, lies in whether there has been such an abuse." *Wilson–X*, 403 Md. at 676.

Nevertheless, a "court's discretion is always tempered by the requirement that the court correctly apply the law applicable to the case." *Arrington v. State*, 411 Md. 524, 552 (2009); *see In re Adoption/Guardianship No. T97036005*, 358 Md. 1, 24–25 (2000) (abuse of discretion where trial judge's decision with respect to discretionary matter "was based on an error of law"); *Guidash v. Tome*, 211 Md. App. 725, 735 (2013) (abuse of discretion occurs when court "makes a decision based on an incorrect legal premise"); *Brockington*

7

*v. Grimstead*, 176 Md. App. 327, 359 (2007) ("an exercise of discretion based upon an error of law is an abuse of discretion").

DISCUSSION

I.    **Estoppel Theories**

    **A. Judicial Estoppel**

Mr. Nusbaum first asks us to consider whether the circuit court properly determined that he was judicially estopped from requesting OCSE to reallocate his child support and alimony payments. He argues that judicial estoppel is inapplicable, as none of the elements of judicial estoppel apply in his circumstances. OCSE seemingly admits that judicial estoppel is inapplicable and argues that the allied doctrine of equitable estoppel should deny Mr. Nusbaum relief.

The circuit court expressly based its ruling on the doctrine of judicial estoppel, and it is there that we begin our analysis. Judicial estoppel is derived from the doctrine of estoppel by admission in English jurisprudence. In *Eagan v. Calhoun*, 347 Md. 72 (1997), the Court of Appeals noted that, "Maryland has long recognized the doctrine of estoppel by admission, derived from the rule laid down by the English Court of Exchequer . . . that '[a] man shall not be allowed to blow hot and cold, to claim at one time and deny at another.'" *Id.* at 88 (citation omitted). Indeed, this Court explained in *Gordon v. Posner*, 142 Md. App. 399, 424, *cert. denied*, 369 Md. 180 (2002), that "[j]udicial estoppel, also known as the 'doctrine against inconsistent positions,' and 'estoppel by admission,' prevents 'a party who successfully pursued a position in a prior legal proceeding from

8

asserting a contrary position in a later proceeding.'" *Roane v. Washington Co. Hosp.*, 137 Md. App. 582, 592, *cert. denied*, 364 Md. 463 (2001). Judicial estoppel, therefore, "precludes a party from taking a position in a subsequent action inconsistent with a position taken by him or her in a previous action." *Dashiell v. Meeks*, 396 Md. 149, 170 (2006).

Three circumstances must exist before judicial estoppel will be used to foreclose a party's claim:

> (1) one of the parties takes a position that is inconsistent with a position it took in previous litigation, (2) the previous inconsistent position was accepted by a court, and (3) the party who is maintaining the inconsistent positions must have intentionally misled the court in order to gain an unfair advantage.

*Bank of New York Mellon v. Georg*, 456 Md. 616, 625 (2017) (quoting *Dashiell*, 396 Md. at 170 (citation omitted)); *Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 297 (2017).

We have noted that judicial estoppel performs two important functions. First, the doctrine "rests upon the principle that a litigant should not be permitted to lead a court to find a fact one way and then contend in another judicial proceeding that the same fact should be found otherwise." *Gordon*, 142 Md. App. at 425 (internal quotations and citations omitted). Judicial estoppel ensures "the 'integrity of the judicial process by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment [.]'" *New Hampshire v. Maine*, 532 U.S. 742, (2001) (citation omitted); *see also Dashiell,* 396 Md. at 171 (explaining the doctrine is used "to protect the integrity of the

9

judicial system from one party who is attempting to gain an unfair advantage over another party by manipulating the court system.").  The Court of Appeals has explained that

> [i]f parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed; the coercive process of the law, available only between those who consented to its exercise, could be set at naught by all.... It may accordingly be laid down as a broad proposition that one who, without mistake induced by the opposite party, has taken a particular position deliberately in the course of litigation, must act consistently with it; one cannot play fast and loose.

*WinMark Ltd. P'ship v. Miles and Stockbridge*, 345 Md. 614, 620 (1997) (internal quotations and citations omitted).  The Supreme Court cautioned, however, that it was "not establish[ing] inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel."  *New Hampshire*, 532 U.S. at 751.  To the contrary, it observed that "[a]dditional considerations may inform the doctrine's application in specific factual contexts."  *Id*.  Therefore, the chief goal of judicial estoppel is to preserve the integrity of the judicial process by precluding a litigant from taking one position in a legal proceeding and taking a contrary position in another legal proceeding.  *See Civil Procedure Intent and the Application of Judicial Estoppel: Equitable Shield or Judicial Heartbreak?*, Dodd, Brian A., 22 AMJTA 481, Fall, 1998.

A subsidiary function that judicial estoppel performs is to protect the party seeking the estoppel. The Court of Appeals has recognized that in addition to protecting the judicial system, judicial estoppel seeks to preserve "'the relationship between the parties to the prior litigation.'"  *WinMark Ltd. P'ship*, 345 Md. at 623 (citation omitted).

## B. Equitable Estoppel

Equitable estoppel, on the other hand, has been defined as the

> effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

3 J. Pomeroy, Equity Jurisprudence, § 804 (5th ed. 1941), quoted in *Leonard v. Sav-A-Stop Services*, 289 Md. 204, 211 (1981). In *Knill v. Knill*, 306 Md. 527 (1986), the Court of Appeals noted that the doctrine "is comprised of three basic elements, 'voluntary conduct' or representation, reliance, and detriment." *Id.* at 535.

In *Creveling v. Government Employees Insurance Co.*, 376 Md. 72 (2003), the Court of Appeals held that a putative class's equitable estoppel claim was not satisfied. The appellant alleged that an insurance company's representations "likely" led putative class members to not retain documentation required for reimbursement. *Id.* at 101. The Court found that because appellants did not provide any evidence, "any prejudice or detrimental reliance suffered by the putative class is purely speculative." *Id.* at 103. Further, it said "any prejudice is dubious because even if claimants lost their medical bills or treatment records, they likely could reconstitute those records by contacting the medical providers." *Id.*

11

### C. The Difference Between Judicial and Equitable Estoppel

We have previously described the difference between judicial estoppel and equitable estoppel. "[T]he former focuses on the connection between litigants and the judicial system, and the latter focuses on the relationship between the parties." *United Book Press, Inc. v. Maryland Composition Co.*, 141 Md. App. 460, 471-472 (2001). Interestingly, "Maryland courts frequently have addressed both concerns under the unified label of judicial estoppel." *Gordon*, 142 Md. App. at 426. "Indeed, both aspects of judicial estoppel are expressed consistently in judicial summaries of the doctrine. '[A] party will not be permitted to occupy inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts and another will be prejudiced by his action.'" *Stone v. Stone*, 230 Md. 248, 253 (1962) (quoting 19 AM. JUR. *Estoppel* § 50); *see also Roane v. Washington County Hospital*, 137 Md. App. 582, 592 (2001) ("The gravamen of a judicial estoppel claim is one party's inconsistency prejudicing his or her opponent's case.").

### D. Neither Judicial nor Equitable Estoppel is Applicable Here

In this case, the circuit court specifically found that judicial estoppel precluded Mr. Nusbaum from requesting reallocation of his support payments. The circuit court found that because Mr. Nusbaum claimed part of those payments as alimony on his federal and state tax returns and lowered his taxable income, he could not now change positions and request that the same payments be deemed child support. Further, when the court initially

12

calculated child support, the full amount of alimony—$3,250.00—was treated as income to Ms. Nusbaum and a loss of income to Mr. Nusbaum, resulting in a lower amount of child support for Mr. Nusbaum. Thus, in the circuit court's view, where Mr. Nusbaum had previously benefitted from claiming part of his payments as alimony, he was judicially estopped from re-casting all of it as child support.

We conclude that although Mr. Nusbaum claimed part of his payments to Ms. Nusbaum as alimony on his income tax returns, that is not the same thing as taking an inconsistent position in different litigation, the first element of the doctrine of judicial estoppel. In each Maryland case where judicial estoppel was invoked, regardless whether the doctrine applied or not, the salient fact is that one party took opposing factual positions in different lawsuits.

For example, in *Eagan*, two children, through their guardian, asserted a wrongful death action against their father for killing their mother. 347 Md. 72 (1997). The Court of Appeals held that the father was judicially estopped from asserting parent-child immunity. *Id.* at 88. The father asserted that he had not abandoned the parental relationship with the children. *Id.* at 81. The Court held that his plea of guilty to voluntary manslaughter in the related criminal case was sufficient to prevent him from denying that he intentionally killed the children's mother. *Id.* at 88. Similarly, in *Gordon*, in a dispute between siblings over their mother's estate, we held that the brother was not judicially estopped from asserting how payments of estate taxes were made in that lawsuit even though he made a different assertion in another case. 142 Md. App. at 428-429. And, in *Matthews v. Underwood-Gary*, 133 Md. App. 570, 578-580 (2000), the appellee claimed in a motor tort action in

13

one county that she needed a bone fusion, yet claimed the same surgery was unnecessary in a different lawsuit in a neighboring county. We held that she was judicially estopped from asserting opposing factual positions. *Id.*

In this case, while Mr. Nusbaum claimed a deduction for "alimony paid" on his income tax filings for several years, he did not do so in a different legal proceeding. First, submission of an income tax return is not a legal proceeding. More pertinent, the fact that the circuit court received Mr. Nusbaum's income tax returns at prior modification of child support hearings, does not alter the fact that those hearings all took place within this same case, not a different one. As we have observed, payment of child support is an ongoing obligation which is always subject to the circuit court's modification. *Prince Geo. Co. Office of Child Support Enforcement ex rel. Polly v. Brown*, 236 Md. App. 626, 634 (2018) ("[T]he non-custodial parent remains 'under a continuing obligation to provide for the support of his children until such time as the order [i]s modified.'"); *Newkirk v. Newkirk*, 73 Md. App. 588, 596–97 (1988). We conclude that Mr. Nusbaum seemingly has taken contrasting positions in the same child support action. Consequently, we cannot find that the first element of judicial estoppel has been met.

For similar reasons, we find that the second element of judicial estoppel cannot be satisfied. Although Mr. Nusbaum claimed part of his overall payments to Ms. Nusbaum as alimony on his income taxes, that fact was not "a position accepted by the court." It is understood that when the circuit court calculated the Child Support Guidelines, both Mr. and Ms. Nusbaum used the alimony payment to determine their adjusted monthly income. In other words, on the Guidelines worksheet the alimony payment is credited as income to

14

Ms. Nusbaum and credited against Mr. Nusbaum's income. The use of the alimony payment in a Child Support Guidelines calculation is not a court-acknowledged assertion made during litigation in a different case. When the circuit court received Mr. Nusbaum's income tax returns into evidence at previous child support modification hearings, it did so at different phases of the same case. In the application of judicial estoppel, to take "a position accepted by the court," means something akin to the father's guilty plea to voluntary manslaughter in *Eagan*. Once the father admitted his guilt in the criminal case, he was judicially estopped from asserting a different position in his children's wrongful death action against him. 347 Md. at 88. Here, as noted, Mr. Nusbaum is taking contrasting positions in the *same* ongoing litigation.

It is a closer call whether Mr. Nusbaum intentionally misled the court "to gain an unfair advantage," the third element of judicial estoppel. Ms. Nusbaum and OCSE argue that Mr. Nusbaum seeks reallocation of all his payments as child support to make it more difficult for Ms. Nusbaum to collect on her alimony payments. OCSE noted at the hearing on the motions to alter, amend, or modify, that once Mr. Nusbaum's child support obligation is satisfied, OCSE must step away from collecting the alimony payments. Ms. Nusbaum will have to use her own resources to haul her former husband into court to collect on the unpaid alimony, which totaled well over $400,000.00 at the last hearing. While arguably this is the case, we shall hold that because the court could not establish the first two prongs of judicial estoppel, the court erred in its application of the doctrine on these facts.

15

We have previously noted that the doctrines of judicial estoppel and equitable estoppel intertwine. In *Gordon* we noted "a significant relationship" between judicial estoppel's concern for judicial integrity and equitable estoppel's concern for prejudice to one party in litigation. 142 Md. App. at 426. We looked to *New Hampshire v. Maine*, 532 U.S. 742 (2001) for guidance to determine when a claim may be barred by judicial or equitable estoppel. *Id.* We recognized that both doctrines were concerned with judicial integrity and prejudice. *Id.* Quoting *New Hampshire*, we noted that "[a] third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." 143 Md. App. at 426-427 (quoting *New Hampshire*, 532 U.S. at 751).

We turn our attention to the latter's application to the facts of this case. As stated, equitable estoppel exists when there is 1) voluntary conduct or representation, 2) reliance, and 3) detriment. *Knill*, 306 Md. at 535.

OCSE asserts that Mr. Nusbaum's acceptance of its allocation of his payments toward alimony, and for purposes of reducing his taxable income, amounts to the first element of voluntary conduct. OCSE also asserts that Ms. Nusbaum relied on Mr. Nusbaum's voluntary acceptance of its allocation by accepting the increase in her income and the corresponding reduction in child support received due to the alimony she received. Finally, OCSE says reallocation would harm Ms. Nusbaum because she could not recover the additional amount of child support she would have been awarded before the alimony allocation reduced Mr. Nusbaum's income, and that she will likely pay more taxes on any alimony she receives in the future, since she will likely return to the workforce.

16

Mr. Nusbaum counters that Ms. Nusbaum did not rely on a voluntary representation he made, since his acceptance of the allocation was something that OCSE forced on him. He further contends that the detriment claimed by Ms. Nusbaum relates only to funds she will not receive if the payments are reallocated, rather than to any money she lost by virtue of her reliance on the allocation in effect.

We conclude that Ms. Nusbaum falls short on the detriment factor, due to our inability to definitively say whether her reliance on the allocation of alimony "led [her] to change [her] position for the worse." *Steele v. Diamond Farm Homes Corp.*, 464 Md. 364, 381 (2019). Whether Ms. Nusbaum will ultimately "net" less under the current allocation structure, or as a result of the reallocation requested by Mr. Nusbaum, is too speculative an issue to satisfy the detriment requirement. Such an equation would necessarily account for the amount her taxable income increased due to alimony received, the amount of money she forfeited in child support by accepting alimony, whether she returns to the workforce and the corresponding effect on her tax bracket and whether she receives the owed alimony payments in the future, and so on. Given that some of these events have not yet come to pass, it would be impossible to prove at this time whether it would have been to Ms. Nusbaum's detriment to rely on the current allocation structure if it were revised. This does not mean we do not recognize the serious inconveniences that would befall Ms. Nusbaum, as well as the additional risks she would face were payments to be reallocated. But these speculative events are not conclusive enough for us to satisfy the detriment factor as it exists in the doctrine of equitable estoppel.

With detrimental reliance not satisfied, we do not reach the issue of whether Mr. Nusbaum's acceptance of the allocation was voluntary conduct. Instead, we proceed to an analysis of MCSA and OCSE's separation of powers argument.

## II. Separation of Powers

OCSE argues that separation of powers prevents us from dictating to the executive branch how to apply support payments. OCSE further contends that the MCSA's bureaucratic process makes allocating support in a manner other than current support first, and support arrearages second, impossible. Mr. Nusbaum counters that OCSE's separation of powers argument disregards the importance of checks and balances, and that separation of powers does not prevent a court from exercising its power "to review and correct actions by an administrative agency which are arbitrary, illegal, and capricious or unreasonable," citing *Criminal Injuries Compensation Bd. v. Gould*, 273 Md. 286, 500-01 (1975). As further support of this point, Mr. Nusbaum contends that the best interests of the child control, and that OCSE's allocation method does not favor the child's bests interests.

Separation of powers issues are jurisdictional; consequently they may be considered on appeal even if not raised below. *Montgomery County Office of Child Support Enforcement ex rel. Cohen v. Cohen*, 238 Md. App. 315, 333–34 (2018) (hereafter "*Cohen*").

For the reasons that follow, we find that we should nevertheless sustain the judgment of the circuit court due to the separation of powers doctrine.

**A. Separation of powers precludes the Court from interfering with the executive agency's lawful administrative authority and discretion**

Under the separation of powers doctrine, the courts may not interfere with OCSE's allocation method if it is lawful. Article VIII of the Maryland Declaration of Rights provides:

> That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other.

Md. Const., Decl. of Rts., art. VIII.

In *Department of Natural Resources v. Linchester Sand & Gravel Corp.*, our Court of Appeals specifically addressed the constraints of judicial review of executive agency functions:

> [T]he judiciary has an undeniable constitutionally-inherent power to review, within limits, the decisions of these administrative agencies. This power of review . . . cannot be a substitution of the court's judgment for that of the agency. In those instances where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries . . .
>
> [F]urthermore, when an agency is acting in a fact-finding capacity (quasi-judicial) the courts review the appealed conclusions by determining whether the contested decision was rendered in an illegal, arbitrary, capricious, oppressive or fraudulent manner.

274 Md. 211, 223–24 (1975). We find the guidance on judicial review of an executive agency's quasi-legislative functions most relevant to the court's ability to review and potentially OCSE's method of allocation of payments.

19

In *Cohen*, cited by OCSE, we articulated that the judicial branch cannot stand in the way of the executive branch in carrying out a mandatory statutory duty. 238 Md. App. 315 (2018). Mr. Cohen, the noncustodial parent, had to pay Ms. Cohen, his ex-wife and mother of his two children, $800 per month in child support. *Id.* at 320. By June 30, 2014, two years after the divorce order, Mr. Cohen owed $8,000 in child support arrears. *Id.* After changing venues, the Circuit Court for Montgomery County ordered Mr. Cohen to pay $200 additional dollars per month exclusively for child support arrears, and an Earnings Withholding Order. *Id.*

Two years later, the Montgomery County Office of Child Support Enforcement ("MCOOCSE") filed a motion to modify child support because one of the two children had reached the age of adulthood. *Cohen,* 238 Md. App. at 321. After lowering the child support obligation monthly by consent, the court addressed Mr. Cohen's accumulating arrears of child support. *Id.* By now, Mr. Cohen owed $21,733.22 in child support arrears. *Id.* Mr. Cohen's current support was lowered but the amount exclusively for arrears was increased by $109 (now $309/month). *Id.* After applying one lump sum of support totaling $3,000, Mr. Cohen applied for a passport. *Id.* The United States Department of State denied the passport request because of the support arrears. *Id.* Mr. Cohen petitioned the circuit court to release the hold on his passport. *Id.* He asserted that, because he was not paying for his travel which required a passport, the intent of the passport hold law was not to deny him a passport. *Id.* at 322. Instead, the intent of the passport hold law was to deny those who possessed funds to travel the opportunity to do so until they paid their child support arrears. *Id.* One of the reasons the MCOOCSE opposed the petition is that the

20

Maryland Child Support Enforcement officials had a statutory duty not to release the passport hold since Mr. Cohen did not meet the exigency exception. *Id*. The circuit court disagreed and ordered the passport released. *Id*. at 323.

We reversed the circuit court's order because we determined that the MCOOCSE had an affirmative duty to deny access to the passport, regardless of who was paying for Cohen's travel. *Cohen,* 238 Md. App. at 340-41. Maryland's regulations create an affirmative duty for this state's Administration to inform the federal government of child support obligors in arrears. *Id.*; COMAR 07.07.17.02(A). The circuit court, we held, had no authority to order the MCOOCSE to release a passport that MCOOCSE was statutorily required to hold. *Id.* Essentially, it was not the proper role of the judiciary under separation of powers to order an executive branch agency to act contrary to its statutory mandate. *Id*.

OCSE also cites *Harvey v. Marshall* as an example of where the Court of Appeals expressly chose not to dictate to the MCSA how to apply support payments. There, Harvey, who originally was the noncustodial parent, had become the custodial parent. 389 Md. 243, 249 (2005). Harvey rarely paid child support as the noncustodial parent and the MCSA sought to continue to enforce the child support arrears even though Harvey was the custodial parent. *Id*. at 250. The Court of Appeals ultimately held that it was not "arbitrary and capricious" for MCSA to refuse to change the way it applied support payments based on how its computers are programmed to apply the payments. *Id*. at 314. The opinion empathizes with the MCSA, recognizing that because it must process payments from many obligors, changing coding in a few instances is infeasible. *Id*. *Harvey* supports the proposition once more that the court may not order an executive agency to change a lawful

21

process it implements in carrying out a statutory duty, particularly where making such a change would be unreasonably difficult or impossible.

*Gould*, cited by Mr. Nusbaum to counter OCSE's separation of powers argument, provides nothing contrary to these principles. There, the Court of Appeals affirmed the circuit court's right to judicial review of a decision made by the Criminal Injuries Compensation Board, in a "proceeding 'before an agency in which the legal rights, duties, or privileges of specific parties are required by law or constitutional right to be determined after an agency hearing.'" 273 Md. At 493–94. The Court also reaffirmed its position that "the Legislature cannot divest the courts of the inherent power they possess to review and correct actions by an administrative agency which are arbitrary, illegal, capricious or unreasonable." Although the "illegal, capricious, or unreasonable" standard appears to apply more specifically to review of an administrative agency's quasi-judicial functions, *Dep't of Natural Resources*, 274 Md. at 223–24, it nonetheless does not contradict the point that the judiciary should not interfere with an executive agency's *lawful* exercise of its discretion.

We conclude that so long as an executive agency's method of carrying out a statutory mandate is lawful, we are precluded from ordering the agency to restructure that method. The question that necessarily follows is whether OCSE's method of allocation is lawful.

**B. OCSE's Allocation of Support Payments is Legally Correct Under Both Federal and Maryland State Law**

Mr. Nusbaum argues that, consistent with state and federal laws, his payments should be paid first to current child support, then to child support arrearages, followed by current alimony, and then finally to alimony arrearages. Conversely, Ms. Nusbaum, joined by OCSE, maintain that current child *and* spousal support are to be paid first, concurrently, followed by any arrearages owed (both child and spousal, or simply "family support"). Both parties base their respective arguments on, namely, federal family support statutes, tax, and bankruptcy laws, albeit with divergent conclusions. The circuit court never addressed these issues because of the estoppel issues discussed earlier. We address them here for the first time.

We hold OCSE's allocation of support payments, first to current child support, second to current alimony support, and third to arrearages of both alimony and child support, to be legally correct. *First,* Maryland family support laws are guided by federal law. The applicable federal law prioritizes current support obligations over arrearages and establishes that spousal and child support obligations are given equal priority. Federal law also indicates equal prioritization of child and spousal support. Maryland law accordingly prioritizes current support payments before arrearages, and recognizes, in related contexts, that both child and spousal support obligation are forms of "intra-familial support" of equal importance. Therefore, OCSE's method of allocating payments to all (child and spousal) current obligations, before any arrearages, is legally correct.

## 1. *Maryland's allocation method is consistent with federal law*

Maryland receives direction over child and spousal support from federal law. Title IV-D of the Social Security Act, 42 U.S.C. §§ 651 *et seq.* (1998) conditions state receipt of federal funding upon the state's passage of these provisions. As such, each state is required to "establish and operate a unit . . . for the collection and disbursement of payments under support orders [.]" *Id*. at § 654(a)(1); *see* § 654(a)(2)(A). In response, Maryland created the Child Support Administration section of the Department of Human Resources to carry out the state's coordination of family support enforcement. *See* Maryland Code Annotated, (1984, Repl. Vol. 2107), Family Law Article ("F.L.") § 10-106. Federal law further mandates that each state disbursement unit establish procedures "for receipt of payments from parents, employers, and other States, and for disbursements to custodial parents and other obligees, the State agency, and agencies of other States," 42 U.S.C. § 654(b)(1), in order to "ensure prompt disbursement of the custodial parent's share of any payment [.]" *Id*. at (b)(2). Maryland implemented such measures in Maryland Code, Family Law Article, Title 10, Subtitle 1, Part I.

Additional guidance for such procedures implemented by states can be found in Title 45 of the Code of Federal Regulations ("CFR"), which covers public welfare regulations. Therein, Subtitle B, Chapter III, concerns the Office of Child Support Enforcement and the standards for program operations. Part 302 requires that, in all state plans, any support amounts collected and distributed in a IV-D case

> shall be treated *first* as payment on the required support obligation for the
> month in which the support was collected and if any amounts are collected

24

which are in excess of such amount, these excess amounts shall be treated as amounts which represent payment on the required support obligation for previous months.

45 CFR § 302.51(a)(1) (emphasis supplied).

If a state agency collects a support amount that "represents payment on the required support obligation for future months, the amount shall be applied to such future months." *Id*. at (b). However, a state plan may not allocate any support amount to future support obligations "unless amounts have been collected which fully satisfy the support obligation under section 403(a)(8) of the Act for the current month and all past months." *Id*.

### 2. *Federal allocation methods are part of an established statutory scheme in Maryland*

The Maryland Code Family Law Article has further adopted federal law pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("Act"). Then-President Bill Clinton signed the Act into law with the purpose of promoting, among other things, "tough personal responsibility and child support enforcement measures." Statement by the President, William J. Clinton, The White House (August. 22, 1996) (https://bit.ly/3726A0S). The Act required all states to adopt the 1993 Uniform Interstate Family Support Act ("UIFSA") Model Act and the 1996 amendments adopted by the National Conference of Commissioners on Uniform State Laws. UIFSA was founded upon four main principles, including, "[the] determination of one controlling order when multiple support orders exist; [the] determination of the state with prospective jurisdiction over the support obligation (known as Continuing Exclusive Jurisdiction, or CEJ); [and

the] simplification of support obligations[.]"[3] Charles J. Muskin, *Uniform Interstate Family Support Act*, MARYLAND BAR JOURNAL, 35 Md. B.J. 54 (January/February 2002). Effective January 1, 1997, Maryland codified the UIFSA in Maryland Code, Family Law Article, Title 10, entitled the Maryland Uniform Interstate Family Support Act ("MUIFSA").[4]

Part II of the enforcement subtitle establishes the MCSA and states its duties. The "Child Support Administration" is a component of "the Department of Human Services." F.L § 10-106.[5] The relevant Duties of the MCSA are to: "coordinate a statewide program for support enforcement", "cooperate with other states in establishing and enforcing child support obligations", and "collect and disburse support payments through the State disbursement unit established under 10-108.7 of this subtitle." F.L §§ 10-108(a)(1); 10-108(a)(7); 10-108(a)(8).[6] Section 10-108.7 "establish[es] a State disbursement unit for collection and disbursement of support payments" when, relevant here, "an employer is required to send payments to a support enforcement agency." Section 10-114 outlines the

---

[3] The fourth major principle of UIFSA, although of little import to this case, is the enactment of relaxed evidentiary rules. Charles J. Muskin, *Uniform Interstate Family Support Act*, MARYLAND BAR JOURNAL, 35 Md. B.J. 54 (January/February 2002).

[4] These statutes have been codified into Title 7, Subtitle 7 of the Code of Maryland Regulations. *See* COMAR 07.07.01 *et seq.*

[5] In 2017, the General Assembly renamed the Department of Human Resources, the Department of Human Services. Otherwise, there has been no substantive change to this section since 2005. 2017 Maryland Laws Ch. 205.

[6] In 2007, the General Assembly changed the references to other statutes in this section, however substantively the section did not change. 2007 Maryland Law Ch. 8.

duties of the Secretary of Human Resources as it relates to support enforcement. One of those duties is to "adopt rules and regulations for the collection of support." *Id.* Given the oversight of the Department of Human Services, its Secretary, and civil servants at the Department and in the Administration, the General Assembly mandates the Administration "promote and serve the best interests of the child in carrying out their child support responsibilities." FL § 10-118.

Mr. Nusbaum is subject to an Earnings Withholding Order. Part III of MUIFSA instructs us regarding earnings withholdings for child and spousal support. An "earnings withholding order" is "an order in a format prescribed by federal law issued by a tribunal to an employer requiring the employer to deduct support payments from the earnings of an obligor." F.L. § 10-120. A Tribunal is, "a court . . . authorized to establish, enforce, or modify support orders or to determine parentage of a child." FL § 10-301(dd).[7] Support subject to earnings withholding is: "(1) child support; (2) spousal support; (3) nondifferentiated child and spousal support; and (4) any medical support ordered by the court." FL § 10-120(d)(1)-(4). Under Section 10-121(a), the Earnings Withholding Order is "immediate and continuing" on all earnings of the obligor. The Article further specifies how much must be withheld from obligors for both current support and arrearages:

(a) The amount of the earnings withholding shall:

(1) be enough to pay the support and any arrearage included in the payments required by the support order; and

---

[7] In 2015, the General Assembly added "of a child" to . . . "or to determine parentage *of a child*" 2015 Maryland Laws Ch. 308. The legislature has also made some stylistic changes to this section. Otherwise, no substantive changes have been made.

27

(2) include any arrearage accrued since the support order.

\*\*\*

(b)(1)(i) When arrearages under subsection (a)(2) of this section are part of an earnings withholding order or earnings withholding notice, the total arrearage withheld shall be in one lump-sum payment or apportioned over a period of time.

F.L. § 10-122.

Additionally, when the parent or spouse is out of state and more than 30 days in arrears on their support obligation, the Administration "shall . . . send to the appropriate [out of] state agency or [out of state] court a request for earnings withholding and any information and fees required by that state to process the request." F.L. § 10-137.

Maryland's calculation of child support is structured in Family Law Article Title 12. Subtitle I describes the nuances of assessing child support and Subtitle II provides the guidelines to calculate child support. One of the rules for assessing child support regarding modifications is that courts are generally prohibited from "retroactively modifying a child support award prior to the date of the filing of the motion for modification." F.L. § 12-104(b). The first section of the child support guidelines defines key terms. Relevant to our analysis is "adjusted actual income," defined as "actual income minus (1) preexisting reasonable child support obligations actually paid; and (2) except as provided in F.L. § 12-204(a)(2) of this subtitle, alimony or maintenance obligations actually paid." In turn, F.L. § 12-204(a)(2) says that alimony is determined first, and then actual income is determined for the appropriate level of child support by deducting the alimony amount from actual income.

28

Maryland Code, Family Law Article, Title 10 has been codified into Title 7, Subtitle 7 of the Code of Maryland Regulations. *See* COMAR 07.07.01 *et seq.* A few separate points from the Code itself are worth mentioning. The Code explains that the distribution of support is governed primarily by the Social Security Act and its regulations. COMAR 07.07.07.02(B)(1). Chapter 1, containing definitions relating to Child Support Enforcement, defines "support" as "child support or spousal support," COMAR 07.07.01.02(B)(30), and "current support" as "the amount of monetary support owed, on behalf of a child, spouse, or former spouse, on a regular interval as specified by a court." COMAR 07.07.01.02(B)(6).

Chapter 19 is relevant as it provides the framework for administrative earnings withholding, COMAR 07.07.19.01, and comes into effect when the MCSA is the intermediary for providing collection and disbursement of child support or when the obligor requests that the MCSA do the work. COMAR 07.07.19.03(A). Here, support is defined as, "(1) Child Support; (2) Spousal Support if included in an order for child support; (3) Nondifferentiated child and spousal support; and (4) Any medical support ordered by a court" including some medical expenses not relevant here. COMAR 07.07.19.02(B)(4). The Code also implies a more specific prioritization of support obligations than that provided in F.L. § 10-122, explaining the "total amount withheld shall be sufficient to pay:

(1) Any current support obligation as specified in the support order;

(2) Any amount specified in the support order to be applied toward arrearages existing at the time the court issued the support order; and

(3) Any amount to be determined by the Administration to be applied toward the arrearage accumulated after the issuance of the support order."

COMAR 07.07.19.04. Maryland therefore prioritizes both current child and spousal obligations before arrearages of both child and spousal support.

### 3. *Federal regulations require prioritization of current support obligations over arrearages*

45 CFR § 302.51(a)(1) requires that OCSE prioritize collection of current support payments before arrearages. Recall this regulation requires that, in all state plans, any support amounts collected and distributed in a IV-D case

> shall be treated *first* as payment on the required support obligation for the month in which the support was collected and if any amounts are collected which are in excess of such amount, these excess amounts shall be treated as amounts which represent payment on the required support obligation for previous months.

45 CFR § 302.51(a)(1).

As noted, Maryland created an Office of Child Support Enforcement in each county to carry out the state's coordination of family support enforcement in order to receive federal funding under Title IV-D of the Social Security Act. Thus, these federal allocation requirements apply to the OCSE in Carroll County. And as they suggest, OCSE interprets and applies them in the MCSA's policy manual where it codes each type of support to

automatically prioritize funds when payments are supplied: first to current child and second to spousal support, then third to support arrearages. [8]

Federal law is clear that support payments are allocated toward current obligations before past due obligations. The question that follows is that which is the greatest point of contention between the parties: whether Maryland law is correct in allocating payments toward current spousal support before child support arrearages.

### 4. Applicable federal law does not distinguish between child and spousal support in determining the allocation of payments

The legislative history surrounding the federal Office of Child Support Enforcement's requirements for state plans, as well as the text of the provisions themselves, indicates that federal law also does not distinguish between child and spousal support in prioritization of payments. In 1981, Congress amended Title IV-D to authorize child support agencies to also collect alimony. Pub. L. 97-35 § 2332 (Aug. 13, 1981); Pub. L. 97-248 § 171(a)(1) (Sept. 3, 1982). The United States Department of Health and Human

---

[8] Unsurprisingly, other state support programs enacted pursuant to the Office of Child Support Enforcement requirements similarly recognize this prioritization of current obligations over arrearages. *See, e.g.*, *Matter of Marriage of Gayer*, 326 Or. 436, 445 n.9 (1998) (citing 45 CFR § 302.51) ("The Oregon Administrative Rules track the federal requirement that child support payments be applied first to current monthly child support obligations and then, as to any excess, to arrearages."); *Hornbeck v. Caplinger*, 227 W.Va. 611, 617 (2011) (citing 45 C.F.R. § 302.51) (Explaining that under West Virginia's Bureau for Child Support Enforcement's allocation model, "pursuant to federal requirement, current support is paid first; money in excess of current support is next applied to principal in arrears."); 921 KY. ADMIN. REGS. 1:420 § 3 (Oct. 2019) ("If the obligor's current support obligations subject to income withholding are satisfied for the current month, the cabinet shall allocate a remaining income withholding amount among the obligor's ordered arrears obligations.").

Services ("HHS") implemented these amendments through a final rule titled "Child Support Enforcements Program—Collection of Support for Certain Adults." 47 Fed. Reg. 57277-01 (Dec. 23, 1982). The rule effectively put child support and spousal support in parity:

> We are implementing the statutory requirements by adding or deleting language in the existing regulations to extend collection and enforcement provisions to include spousal support. To the extent possible, we are simply deleting the word "child" wherever it appears before the word "support" to indicate that the regulatory provision applies to any support collected or enforced. However, in certain circumstances, this approach is not possible and alternative language is used for clarity.

*Id.* at 57278-79. HHS required that all alimony payments be made through the state support enforcement agency and "in accordance with the requirements of 45 C.F.R. § 302.51." *Id.* at 57278. The rule also listed "302.51 Distribution of child support collections" as one section where such changes were "necessary . . . to include spousal support in the State plan requirements addressed in each section." *Id.* at 57279. Accordingly, § 302.51, now "Distribution of support collections," contains no mention of the word "child" or "spousal" before its many references to "support." In the absence of "alternative language . . . used for clarity," the use of "support" on its own should therefore "indicate that the regulatory provision applies to any support collected or enforced." 47 Fed. Reg. 57278-79. Thus, the requirement that current support obligations are to be paid before arrearages under §

302.51(a)(1) supports the prioritization of both current child *and* spousal obligations before arrearages of either.[9]

### 5. *Federal tax law does not preempt the support allocation scheme*

Mr. Nusbaum emphasizes federal tax law as the foundation of his argument that all child support is to be paid off before allocating any funds to alimony. Section 71 of the Internal Revenue Code provides a distinction between alimony/maintenance payments and child support.[10] 26 U.S.C.A. § 71 (b) – (c) (2017, repealed 2019). Mr. Nusbaum points to some U

United States Tax Court cases demonstrating this distinction. For example, in *Blyth v. Commissioner*, 21 T.C. 275 (1953), the father's payments to the mother were less than the full amount of support owed in the previous tax year. The court held the funds paid were to be considered child support up to the designated amount owed for the year, and only the excess of that amount could be deducted as alimony. *Id.* at 279. Similarly, in *Proctor v. Commissioner*, 129 T.C. 92 (2007), a divorce decree required the non-custodial

---

[9] Prioritization of current child and spousal support obligations before arrearages finds further support in other state support agencies' allocations structures. For example, The Oklahoma Department of Human Services Child Support Services (CSS) allocates and distributes support collections in its Title IV-D cases pursuant to 42 U.S.C. § 657 and 45 C.F.R. §§ 302.32, 302.51 and 302.52, OKLA. ADMIN. CODE § 340:25-5-351(a). Payments are first "prorated to the current child support, cash medical support, and spousal support," and second, "prorated to the monthly plan on past support . . ." *Id.* at §(c)(2).

[10] As of February 14, 2019, 26 USCA § 71 was repealed and replaced by proposed legislation. H.R. 1244, 116th Cong. (2019). However, its repeal does not affect our decision, as Section 71 was the law during the parties' marriage, divorce, and domestic support proceedings. As such, we shall be guided by its application to the facts of this case.

father to pay the mother $2,687 for their children's uninsured medical expenses and $5,313 for alimony in 2002. *Id.* at 94–95. The father paid only $6,074 and deducted the entire sum as alimony on his taxes. *Id.* The court held that pursuant to § 71(c)(3), $2,687 of the $6,074 was to be treated as child support, and only the remaining $3,387 should have been deducted as alimony. *Id.* at 95–96.

While these cases do support the proposition that alimony cannot be deducted from income when the obligor has not paid his full child support obligations for the year, we do not find them dispositive in this case. Mr. Nusbaum did not bring this suit to challenge the imposition of a tax penalty based on a claim that he incorrectly deducted as alimony funds that were otherwise allocated by the State as child support. In *Blyth* and *Proctor*, the Court was not deciding upon the prioritization of funds involving arrearages from years preceding the relevant tax year. And the respondent in both cases was the Commissioner of Internal Revenue; the former spouse was not a party to either suit, and so no challenge was brought as to the actual *distribution* of the payments. Mr. Nusbaum's tax filings were raised only to show he had previously relied on the State's allocation of his payments toward alimony before satisfying all child support arrearages in order to reduce his taxable income.

While any change to the current allocation of Mr. Nusbaum's payments would have tax implications, the matter before us is not a tax issue. Not only is this not the relief sought by either party, but it simply does not withstand reason that we might rely solely on tax code to determine that a state agency has incorrectly structured its family support program—a program enacted pursuant to separate federal law that does *not* specify an allocation method that reflects the prioritization in the tax code. If Mr. Nusbaum seeks a

34

reallocation of his past payments for tax purposes, the U.S. Tax Court is the appropriate forum.

We also do not find the tax code should supersede the prioritization implied by the public welfare regulations, since the distinction made in the tax code is similarly absent in other areas of federal code. One such area is the United States Bankruptcy Code, which treats child and spousal support equally in the context of creditor priority. 11 U.S.C.A. § 507 (2019). Federal law indicates that "unsecured claims for *domestic* support obligations" have the highest priority[11] in the settlement of bankruptcy claims, whether they "are owed to or recoverable by a spouse, former spouse, or child of the debtor, or such child's parent, legal guardian, or responsible relative . . . on the condition that funds received . . . shall be applied and distributed in accordance with applicable nonbankruptcy law." *Id*. at § 507(a)(1)(A) (emphasis supplied).

### 6. *Maryland law suggests equal prioritization of child and spousal support*

Consistent with the federal Child Support Enforcement Program, Maryland law defines "support" as both child and spousal support. MUIFSA, under Family Law Article, Title 10, as well as Title 7, Subtitle 7 of the Code of Maryland Regulations, consistently include both child and spousal support in their definitions of "support." FL § 10-120(d)(1)-

---

[11] Prior to the 2010 amendments, domestic support was seventh in priority to other unsecured claims. 11 U.S.C.A. § 507 (2005, amended 2010). However, this does not defeat our position that this area of federal code does not indicate that either child or spousal support obligations should be prioritized above the other.

35

(4);    COMAR    07.07.01.02(B)(6);    COMAR    07.07.01.02(B)(30);    COMAR

07.07.19.02(B)(4).

Maryland courts have yet to hear a case challenging whether spousal support is on

par with child support as a higher priority than any arrearages.  However, OCSE directs us

to a series of cases recognizing areas of Maryland law where spousal and child support are

considered together because of their similar nature.  These cases focus primarily on Title

III, Section 38 of the Maryland Constitution, which exempts both obligors of past due

alimony and obligors of past due child support from Maryland's prohibition on

imprisonment for reason of debt.  MD. CONST. art. III, § 38 (2001)).

For instance, in *Goldberg v. Miller*, the Court of Appeals held the circuit court did

not have the authority to classify guardian *ad litem* fees as child support, because there was

a lack of statutory support for making such a classification, and "the General Assembly is

the guiding authority for matters of child support in Maryland."  371 Md. 591, 612 (2002).

In its analysis, the court acknowledged that child support was "the highest and most

protected status an obligation can hold under the Maryland law."  *Id.* at 611.  The State

cites specifically to a corresponding footnote where the court stated, *"*Under Maryland law,

alimony receives the same protections as child support," explaining Section 38's permitting

imprisonment of both child support and alimony obligors.  *Id.* at 611 n.9 (citing MD.

CONST. art. III, § 38 (2001)).

Relating specifically to the Maryland Family Law Article, OCSE cites *Kelly v.

MCOOCSE*, 227 Md. App. 106 (2016).  There, this Court held an obligor's bank accounts

could be garnished for past due child support pursuant to FL § 10–108.3(b)(1).[12]  *Id.* at

113–14.  The obligor challenged the line of cases used to support that garnishment was

permissible due to child support's nature as a *duty*, rather than a debt (for which

garnishment of certain assets is exempted), on the grounds that the cited cases dealt with

unpaid alimony.  *Id.* at 113, n.4.  We explained:

> The distinction [between alimony and child support] is not significant. All
> three cases, although specifically pertaining to alimony, framed their
> analyses in terms of "intra-familial support," *see Pope v. Pope,* 283 Md. 531,
> 536 (1978) ("[T]he underlying obligation is for intra-familial support...."); 
> *United States v. Williams,* 279 Md. 673, 678 (1977) (same); *Blum v. Blum,*
> 295 Md. 135, 142 (1983) (describing the obligation to provide contractual
> alimony as a duty to provide intra-familial support).  We conclude their
> holdings are equally applicable to claims for child support.

*Id.*

Standing alone, these cases support, but admittedly do not prove, the Maryland

legislature's intent for current child and spousal support to be prioritized above all

arrearages in the allocation of payments.  However, taken together with the relevant parts

of the Family Law Article and Code of Maryland Regulations described above, they

demonstrate, at a minimum, that OCSE's interpretation of Maryland law to assign equal

---

[12] The provision reads "(b)(1) If an obligor identified in a report submitted under §
10-108.2 of this subtitle or in a report made to the Federal Parent Locator Service under 42
U.S.C. § 666(a)(17) is $500 or more in arrears of a child support obligation and has not
paid child support for more than 60 days, the Administration may institute an action to
attach and seize the amount of the arrearage in one or more of the accounts of the obligor
with a financial institution to satisfy the amount of arrearage owed by the obligor." FL §
10–108.3(b)(1)

importance to child and spousal support obligations is a reasonable interpretation, and not in apparent contravention of the law.

Given that (1) relevant federal law mandates prioritization of current "support" obligations over arrearages, (2) contains no requirement that all types of child support payments be prioritized above all types of spousal support payments, (3) but indicates spousal support is to be viewed as equally important to child support, and (4) Maryland law makes no distinction between child and spousal support in defining "support" obligations, we find that OCSE's allocation of payments first to current child support, then to current spousal support, and finally to child and spousal support arrearages, is not unlawful.

## C. The Child's Best Interest Standard Does Not Mandate Restructuring OCSE's Allocation Method to Prioritize Child Support Arrearages Before Current Alimony Support Obligations

The child's best interest standard does not make unlawful, or even unreasonable, OCSE's current allocation method. Mr. Nusbaum first points to *Ross v. Hoffman*, 280 Md. 172 (1977) citing the case's holding that the best interest of the child is supreme, to encourage us to hold that, if the statute, rules, and policies are ambiguous, then we should fall back on *Ross*' guidance to do what is best for the child first. *Ross* is a custody case in which the Court of Appeals upheld the trial court's finding that the "best of interest" of a child was served by keeping the child in the care of a third-party guardian instead of the parent themselves. *Id.* at 193. Karen Ross, the appellant in that case, hired a babysitter when she had a baby at 21. *Id* at 181. Over time, the babysitter became so much of a primary caregiver that the child developed an emotional bond with the babysitter and not

38

with the biological mother. *Id.* at 181–82. The court held it would be in the child's best interest to remain in the care of the babysitter. *Id.* at 192-93.

Mr. Nusbaum also refers to *Goldberger v. Goldberger* for the assertion that we have found, in at least one instance, that even though a father chooses not to support his children for religious reasons, the children's best interests may require him to provide support. In *Goldberger*, an orthodox Jewish family had a father who studied Jewish law all day but did not earn income of his own. 96 Md. App. 313, 322-23 (1993). We found that he could earn income but chose not to, *id.* at 323, and so we remanded to the circuit court to determine how much support he should pay to the mother. *Id.* at 328-29.

While we agree with Mr. Nusbaum that relevant Maryland laws and policies emphasize a child's best interests, that standard does not dictate that support payments be allocated to child support arrears before current spousal support obligations. In *Ross* and *Goldberger*, the courts set out to determine what was most beneficial to the children, intentionally setting aside the parents' personal interests having no bearing on the children's well-being. But spousal support does not fit into that category. In the same vein that Maryland and federal law promote an overarching goal of intra-familial support, we recognize that support of the custodial spouse is often necessary for the children's well-being. The two are not mutually exclusive. Child support will not guarantee the best outcome for a child if his or her custodial parent does not have the means to take care of him- or herself.

It is worth restating that should Mr. Nusbaum's payments be allocated as he requests, Ms. Nusbaum will lose a critical means of enforcement for spousal support owed

to her once Mr. Nusbaum satisfies his child support obligations.  According to 45 C.F.R. §

302.31(a)(2), a state child support agency can

> [S]ecur[e] support for a spouse or former spouse who is living with the child or children, but only if a support obligation has been established for that spouse and the child support obligation is being enforced under the title IV–D State plan.

45 C.F.R. § 302.31(a)(2).  As OCSE points out, this means that once child support is no

longer owed, its agency cannot be used to enforce a remaining spousal support obligation.

We see less how Mr. Nusbaum's requested reallocation will benefit the Nusbaums' grown

children, and more how it could harm Ms. Nusbaum.

We conclude that the payment of spousal support is as important an interest to the

welfare of a couple's children as is the payment of child support.  Maryland and federal

support statutes oblige us to consider both equally.  Thus, the child's best interest standard

does not overcome the support OCSE's allocation structure finds in relevant state and

federal law.  Because this allocation structure is lawful, the judiciary is precluded by

separation of powers from interfering with its operation.  Accordingly, we sustain the

judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**